**GREEN AVENUE APARTMENTS, Inc., v. CHAMBERS et al.**

No. 4719.

Court of Civil Appeals of Texas. Beaumont.

April 12, 1951.

Rehearing Denied May 16, 1951.

Stewart Burgess & Morris, Houston, for appellant.

A. A. McWharter, Fred White, Port Arthur, for appellees.

WALKER, Justice.

This appeal was taken from an order granting a temporary injunction restraining the erection of certain improvements on tract 22 in Laurel Place Addition to the City of Port Arthur. Appellees are plaintiffs and the appellant is one of three defendants, two of whom, Mrs. Rosa Gaertner and her daughter Laura Gaertner, did not appeal, although injoined as was appellant.

Tract 22 is owned by defendant Green Avenue Apartments, and it was conveyed to said defendant by Bush, Thompson and Mrs. Westerhoff, to whom it had been conveyed by the defendants Gaertner. The plaintiffs own other lots in this addition, on which they reside, and at least some of them bought their property from the defendants Gaertner.

The suit is founded upon certain covenants which restrict the use of land in Laurel Place. Defendant Green Avenue Apartments plans to erect 21 multiple dwellings on tract 22, containing a large number of apartments, and said defendant intends to let them to members of the public. Plaintiffs contend that the restrictive covenants apply to tract 22, and that the use of tract 22 which defendant Green Avenue Apartments intends to make will violate these covenants. Plaintiffs prayed for relief by way of injunction, both temporary and permanent, and the prayer for a temporary injunction was granted after a hearing. Evidence adduced at this hearing shows the following matters: Laurel Place is a subdivision made by F. C. Gaertner and his wife, the defendant Rosa Gaertner, of land which they owned at the time. Mr. Gaertner died subsequently, prior to the exchange of lands hereinafter mentioned, which occurred in 1940 or 1941.

The original plat and the instrument dedicating public ways and declaring restrictive covenants were made by Mr. and Mrs. Gaertner. These documents were dated May 31, 1939, were filed for record in the office of the County Clerk on June 17, 1939 and were recorded in the Deed Records of the county on June 23, 1939. They were also recorded in the map records.

The instrument containing the dedication of ways and declaring the restrictive covenants reads as follows:

"Know all men by these presents: That we, F. C. Gaertner and Rosa Gaertner, husband and wife, of the County of Jefferson, State of Texas, being the owners of that tract of land described in the surveyor's certificate, dated April 27, 1939, which land is the same land conveyed to said F. C. Gaertner by deed recorded in Vol. 124, pg. 543, of the Deed Records of Jefferson County, Texas, and by Receiver's Deed, recorded in Vol. 180, pg. 275, of the Deed Records of Jefferson County, Texas, being in and a part of Lot Number Seven (7), in Block Number Four (4), Range "G" of the Port Arthur Land Company's survey of lands in Jefferson County, Texas, (excepting a tract 295 feet by 310 feet heretofore sold to H. Hosen) to which maps and deeds and the records thereof reference is now hereby made for metes and bounds description of the tract of land now owned by the undersigned, have caused the same to be surveyed, subdivided, platted and laid out into lots, streets and avenues and public highways as shown upon the accompanying map for the purpose of establishing a Subdivision which shall be known as Laurel Place Addition to Port Arthur, Jefferson County, Texas.

"And, We, the said owners, do hereby Give, Grant and Dedicate all those strips of land, as shown upon the accompanying map of said Laurel Place as streets, avenues and public roads to the public to be so used as streets, avenues, roads and highways forever.

"For the purpose of establishing and maintaining a general plan and building scheme uniform over the entire Addition herein created for the protection and benefit of all owners of any lot or lots in said Addition hereafter, I do hereby charge each and all of the lots in said Addition, as shown upon said map, and do fix and establish the following as conditions and restrictions upon the use, occupancy, and sale of any such lot or lots:

"First: Any lot or lots in said Addition, when sold, now and hereafter, shall be used for residential purposes only, and only one dwelling house with the necessary outhouses therefor shall be constructed and maintained upon any such lot of land.

"Second: Except as otherwise noted below, each and every dwelling house to be erected upon any lot or lots in said Addition must front in the direction of the site, and the main building of such improvements shall be situated at least Twenty-five (25) feet from the said front street or property line, and no resident or out-buildings shall be built closer to either side of an adjoining lot property line than Five (5) feet.

"Third: The main dwelling house to be erected upon any such lot shall cost and be of the reasonable value of not less than Two Thousand ($2000.00) Dollars. No tents, shacks, trailers, or garages shall be occupied as living quarters on said premises prior to or following the completion of the permanent or main dwelling upon any lot, to the end that the said main dwelling shall be first constructed. Provided, however, that this restriction shall not prevent the maintenance of quarters in the nature of garage apartments, or otherwise, to be occupied by the servants of the owner or tenant.

"Fourth: The rear five (5) feet of all lots, being a strip of land five (5) feet in width across the rear end of each lot, shall always bear and be charged with a utility easement for the purpose of placing and maintaining thereon and thereunder any and all improvements or apparatus, pipes, poles, wires, cables, conduits and other instrumentalities necessary or needful in and about the transmitting, conducting and distributing of electric current, telephone, and other public utility service, and to that end the agents, servants and employees of any person, firm or corporation, giving public utility service, shall have the right of ingress and egress, in, over and across said rear five (5) foot strip and no improvement or hindrance will be placed upon said rear five (5) foot strip that will materially interfere with the operation of such public utility.

"Fifth: Neither said land nor improvements or any portion thereof shall be sold, leased, or resold at any time to any person or persons not belonging to the white or Caucasian race; provided, that this covenant shall not prevent occupancy by domestic servants of a different race employed by the owner or tenant.

"Sixth: No retail or wholesale shop or store shall be erected or any business or industry, or any obnoxious or offensive trade shall be carried on upon said premises or anything be done thereon which may be or become an annoyance or nuisance to the neighborhood, and, especially, no malt, vinous, or spiritous liquors of any nature or other intoxicating liquors of any nature whatsoever shall be bartered or sold upon any lot.

"We, the said Grantors herein, the present owners of said land and all of the lots into which the same shall be subdivided and shown upon the accompanying map, do hereby declare that any and all deeds by us hereafter made conveying any lot in the Addition herein created shall by reference to the accompanying plat and this dedication adopt and declare the above and foregoing conditions and restrictions as a part of the consideration for such conveyance or conveyances the same as if the said conditions and restrictions were set out in full in any such deed or deeds.

"Each and all of the above conditions and restrictions shall be and remain in full force and effect, and run with the title to each of said lots for a period of Twenty-five (25) years from and after the date hereof, excepting the condition or restriction Number Four (4) establishing a public utility easement, which shall be and remain in full force and effect for said period of Twenty-five (25) years from and after this date and as much longer as the same shall be necessary for the purposes therein set forth, not exceeding the period of Fifty (50) years from this date."

The term "lot" used in this instrument was not defined.

A plat of the Addition, delineating the Addition as it is now and also as it was in 1939, is as follows:

## No. 34
### LAUREL PLACE
Part of
Lot 7, Block 4, Range "G"
Port Arthur Land Co.'s Survey
Jefferson Co., Texas
Scale 1" – 80'

There is nothing on the plat or in the instrument dedicating ways and declaring covenants which indicates that tracts 1, 22 and 32 were intended for any public use, or were intended for the special use and benefit of such persons as became the owners of the 29 lots which are marked on the plat as 50 feet wide.

Certain changes have been made in some parts of the Addition since 1939. Thus in 1939 tract 32 was an undivided tract covering 1.01 acres but it has since been divided into 6 lots. The proof does not show exactly when tract 32 was subdivided but Mrs. Gaertner said that this occurred before any lots on Green Avenue were sold. Mrs. Gaertner described these lots in tract 32 as being 50 feet wide by 150 feet long. These dimensions do not precisely fit the dimensions of tract 32 shown on the plat, but we infer, from a comparison of the dimensions stated by Mrs. Gaertner with the dimensions marked on the plat and from the location of the houses on tract 32 shown by the aerial photograph of the Addition, that 3 of these 6 lots face Twin City Highway and the other 3 face Red Bird Lane. These 6 lots have been marked upon tract 32 by the broken lines shown on the plat above.

Further, the defendants Gaertner, in 1940 or 1941, made an exchange of lands which changed the form of tract 22 and converted it into a rectangle. They apparently conveyed the northwestern part of the original tract 22 and received a small triangular tract in the southernmost part of the Laughlin & Barrier Addition. The length of tract 22 from east to west was not changed; it remains 810 feet and extends along Green Avenue for this distance, from the southeastern corner of lot 23 to the eastern line of the Addition as originally platted. Tract 22 is now 250 feet wide from north to south, and its northern line extends from the northeastern corner of lot 27 to the eastern line of the Addition parallel to Green Avenue. The present northern line of tract 22 is marked on the plat by a broken line; before the change in the form of tract 22, the northern line of the tract was the line on the plat marked S. 27°—07′ E. The present area of tract

22 is 4.64 acres. According to the original plat, it was originally 5.07 acres.

The 21 multiple dwellings which defendant Green Avenue Apartments plans to erect would be one-story in height and of two sizes. One type, of which 11 are planned, would contain two apartments. Each of these buildings would be 20 feet wide and 50 feet long. The other type, of which 10 are planned, would contain four apartments. Each of these buildings would be 20 feet wide and 100 feet long. Six of the dwellings containing two apartments would be erected along the front of tract 22, facing Green Avenue; that is, the long axis of the buildings would be parallel to the line of the street. Five of this type of dwellings would be erected upon the rear portion of tract 22, the long axis of these buildings also being parallel to the street. Between these two groups of buildings would be erected the 10 buildings of the other sort; the long axis of these buildings would be perpendicular to the street line. The total number of apartments in these 21 dwellings would be 62; and 62 garages, one for each apartment but assembled in two buildings, (four, according to the architect's sketch) would be erected along the northern line of tract 22. The architect's sketch shows two other structures which would be situated at the center of the northern line of tract 22; we infer from the testimony of Mr. Bush that these structures were intended as storerooms for the garbage cans of the tenants. The location which these various buildings would have on tract 22 has been approximately shown on the plat. Such walks and ways over tract 22 as would be needed by the tenants were also planned. The various buildings would be of wooden construction, apparently uniform in character and appearance but comparable in quality and cost to that of the homes erected in Laurel Place; and provision has also been made for the planting of shrubbery and the beautification of tract 22. The impression concerning the improvements intended to be erected on tract 22 which the evidence describing these improvements leaves upon the mind is that of something like a well planned Army barracks.

Each of the 62 apartments was intended for the use of one family.

When plaintiffs' prayer for temporary injunction was heard, the defendant Green Avenue Apartments had done some work toward leveling the surface of tract 22 and the making of foundations for the dwellings; but we infer that this work was halted before much had been done.

The only means of access to the properties of the plaintiffs and of the defendant Green Avenue Apartments is Green Avenue.

We have mentioned the subdivision made of tract 32. Tract 22 has never been subdivided and the only change made in it was that mentioned above. No subdivision of tract 22 is intended, and the plan according to which the various buildings would be located does not represent a subdivision of the tract.

According to plaintiffs' allegations, plaintiffs own lots 5 to 11, inclusive, and lots 13 to 19 inclusive. Only 2 of the plaintiffs, namely Myers and Gant, testified; Myers now owns lot 10, although he purchased three lots, and Gant owns lots 13 and 14. These lots, as well as the lots which the other plaintiffs allege to be theirs face tract 22 and are separated from it by the width of Green Avenue. The proof does not show exactly when the defendants Gaertner conveyed tract 22 to Bush, Thompson and Mrs. Westerhoff, nor when these persons conveyed the property to defendant Green Avenue Apartments. We infer, however, that the defendants Gaertner conveyed the property after the plaintiffs Myers and Gant bought their properties. Gant testified that he bought his property about January, 1947. Myers made a contract with Mrs. Gaertner to purchase his property which is dated January 14, 1946, and the defendants Gaertner conveyed the property to him on April 14, 1947. The proof does not show when any of the other lots in the Addition were sold.

The defendant Green Avenue Apartments is a Texas Corporation. It has two classes of stock one of which was referred to by Mr. Bush, the president of the corporation, as preferred stock, and is owned by the Federal Housing Authority; and Mr. Bush testified that the control of the corporation was vested in the owner of the preferred stock. The other class of stock is owned by Mr. Bush and the two persons to whom the defendants Gaertner had conveyed tract 22. The capitalization of defendant Green Avenue Apartments is $36,500 and Mr. Bush testified that approximately $6,000 of this sum was money and that the balance of the capitalization was tract 22. Mr. Bush testified further that a lien to secure payment of approximately $350,000 had been fixed upon tract 22; this sum presumably represents the fund from which the planned improvements would be made.

The business, and the object, of the defendant Green Avenue Apartments will be the rental of the 62 apartments intended to be erected on tract 22. The property is not intended for sale.

Mr. Bush testified that the multiple dwellings would be erected unless this was injoined and that a building permit, and the approval of the City Planning Commission and the City Council of Port Arthur had been secured.

We have referred to the proof concerning the date when tract 32 was subdivided. When plaintiffs' prayer for a temporary injunction was heard, four houses were standing on tract 32. The plaintiff Myers, whose contract of purchase was dated January 14, 1946 and whose deed was dated April 14, 1947, testified that when he "purchased" there were two and probably three of these houses standing. Subsequently, the fourth house was erected. The plaintiff Gant, who said that he purchased his property "around January, 1947" gave somewhat contradictory testimony. He thought that *all* of the four houses on tract 32 had been erected after he bought his property. The aerial photograph of the Addition shows these houses, and according to this photograph the houses on tract 32 are one-story in height and are comparable in appearance and size to the houses erected elsewhere in the Addition. Mrs. Rosa Gaertner said that the houses on tract 32 were "one unit dwelling houses" and were not apartment houses.

The substance and effect of the evidence concerning the subdivision and improvement of tract 32 is that this tract is now substantially like those parts of the Addition owned by the plaintiffs.

As we have stated, only Myers and Gant, of the several plaintiffs, testified. Each said that he knew of the restrictions upon use of land in Laurel Place when he bought his property in this addition, and each said that he would not have bought his property without these restrictions. Each said that he wanted the restrictions to be enforced. Both Myers and Gant said that they had discussed the restrictions with Mrs. Gaertner before making their purchases. Myers did not testify to what was said between him and Mrs. Gaertner. Gant testified that Mrs. Gaertner told him "there would be one dwelling house per lot, all the houses built in such addition to be for the general scheme and general good of the addition;" that she said that only one family would be housed in each house, "and I was of the opinion that the lot or tract across the street (he is referring to tract 22) was going to be cut up in 90 foot lots; that is what she told me." He testified further that he thought, when he bought his property, that such apartments as were planned by defendant Green Avenue Apartments could not be erected in the addition. Mrs. Rosa Gaertner denied that she said the restrictions applied to everything and that she would see that these restrictions were enforced. She said: "we did not own half of the property then" (referring to the occasions when she talked with Myers and Gant). There is evidence showing that Mrs. Rosa Gaertner and her daughter Laura Gaertner declared certain restrictions upon the use of tract 22 in February, 1950, and that again in June, 1950, apparently with defendant Green Avenue Apartments, made a declaration of other restricted covenants pertaining to tract 22. These declarations of restrictions were offered in proof by the defendant Green Avenue Apartments but were excluded by the trial court. It does appear however that none of the persons owning other lots in the addition were consulted by the defendants before these declarations were made, and these declarations represent the unilateral acts of the defendants.

Neither Myers nor Gant had made any objection to or criticism of the subdivision of tract 32 nor any to the erection of more than one house on tract 32, and it is apparent that they consented to these actions. Myers knew of the subdivision when he bought his property. He construed the subdivision of tract 32 as making it "conform to our general building scheme," and said that he could not raise any objections to the houses on tract 32 when he bought his property "as long as they weren't obnoxious." The proof does not show whether Gant knew or did not know of the subdivision of tract 32 when he bought his property. He explained his failure to object to the construction of more than one house on tract 32 by the statement that "I didn't see any reason to."

The plaintiff Berg was occupying a garage apartment when this suit was filed. He had purchased lots 8 and 9 and this apartment was situated on this tract. Myers and Gant knew of this use of lots 8 and 9 and consented to it because, they said, of assurances given them that the use was only temporary and that a dwelling would eventually be erected. This use by Berg appears to be a violation of restriction 3.

The only instruments of title in evidence, other than the plat and the dedication of ways and declaration of restrictions were Myers' contract of purchase and his deed. This contract contends the following provisions: "Fourth: The General Warranty Deed to be given by Owner to the Buyer when the purchase price shall be paid shall by reference to the Dedication of said Addition adopt and include all of the restrictions and conditions as set out in said Dedication established for the purpose of maintaining a general plan and building scheme uniform over the entire Addition for the protection and benefit of all owners of any lot therein, which conditions and restrictions are as follows." This language is followed by the several restrictions, and these are followed by the provisions of the next to last paragraph in the declaration of 1939, providing that the restrictions should run with the land for certain per-

iods of time. Myers' deed recites a consideration paid and "the further consideration of the acquiescence and their compliance with the conditions and restrictions set out in the dedication of Laurel Place Addition—which are hereby made a part hereof." The property conveyed to Myers is described in this deed as "Lots numbered eight (8), nine (9) and ten (10) of Laurel Place Addition. As the same appear upon the map or plat of said Laurel Place Addition on file and on record in the office of the County Clerk * * *." The habendum clause is in the customary form, referring to "all and singular the rights and appurtenances" of the property conveyed.

With the possible exception of Mr. Berg's garage apartment, the houses of the plaintiffs seem to comply with the restrictions. This inference is based upon the aerial photograph of the Addition and upon Gant's testimony that plaintiffs' houses had cost more than $2,000.

Myers' contract with Mrs. Gaertner states that the purchase price of the three lots sold was $1200 or an average of $400 per lot. It is a reasonable inference that the other 50 foot lots were sold at a comparable price.

## Opinion

The order of the trial court is based upon conclusions that restrictions 1 and 6 are elements of a general plan or scheme for restricting the use of land in Laurel Place, which applies to tract 22, and that the use of tract 22 which defendant Green Avenue Apartments plans to make would violate these two restrictions. Restriction 1 contains more than one requirement and the trial court's order does not show whether the use intended by defendant was held to be a violation of the limitation of use to "residential purposes only." The order does show that the "dwelling house" in the requirement prohibiting more than one of the same on each lot was construed to be one suitable for the occupancy of no more than a single family, and that erection of multiple dwellings was held to be a violation of this requirement. The provision of restriction 6 held to be violated was that prohibiting "any business;" the trial court found as a fact that the use intended by defendant Green Avenue Apartments would amount to a "business" within this prohibition of restriction 6.

Defendant Green Avenue Apartments has filed four Points of Error for reversal.

Defendant does not deny the existence of a restrictive scheme or plan which covers at least part of the Addition and which, within at least that area, can be enforced by plaintiffs. The contentions made by defendant are, in essence, that the restrictive scheme proved had either been abandoned or did not cover tract 22 or did not forbid the use which said defendant planned to make of tract 22.

Point 3 invokes the doctrine of waiver and may be disposed of summarily on the authority of Stewart v. Welch, 142 Tex. 314, 178 S.W.2d 506. If restriction 1 was applicable to tract 32 and prohibited the erection of more than one dwelling upon that tract, the subdivision of the tract and the erection of the houses thereon has made the use and improvement of tract 32 substantially like the use and improvement made by the plaintiff by their own lots. The plaintiffs could not have sustained any damage or inconvenience from the subdivision and improvement of tract 32. It must also be noted that tract 32 is located a substantial distance from the property of many of the plaintiffs, including the properties of the two plaintiffs who testified, Myers and Gant. The same thing is true of Berg's use of his garage apartment as a temporary place of abode. If his use did violate restriction 3, the aerial photograph and the other evidence shows that this garage apartment is the only one in Laurel Place and it was also a considerable distance from the properties of at least some of the plaintiffs. The use made by Berg and the subdivision of tract 32 cannot be said, on the proof before us, to have so changed the general plan and scheme expressed in the declaration of restrictive covenants as to deprive the scheme of value to plaintiffs, and plaintiffs' acquiescence certainly did not amount to an abandonment of the scheme as a matter of law. The question on the appeal is whether the evidence indicates a probable right and we think the evidence sufficient to support the

trial court's order as against the assignment made in Point 3.

Point 3 is accordingly overruled.

We shall discuss Points 1, 2 and 4 together. The arguments made under these Points may be briefly summarized as follows:

Under Point 4 defendant Green Avenue Apartments argues, in effect, that the use of tract 22 which said defendant intends is *residential* and not *commercial* and for this reason is not a "business" within the meaning of restriction 6.

Under Points 1 and 2, defendant Green Avenue Apartments argues first, that the restrictions do not apply to tract 22. Defendant, in effect, divides Laurel Place into two sorts of property and contends that the covenants apply only to the 29 lots marked on the plat as fifty feet wide and do not apply to the three large tracts which are numbered 1, 22 and 32 on the plat. This argument is based upon several circumstances. One of these circumstances seems to be the correspondence in size and shape of the 29 fifty foot lots with the ordinary city lot. Defendant says that the restrictions apply to "lots" and that this word means something comparable to the ordinary city lot—which would necessarily exclude such large tracts as those numbered 1, 22 and 32. Another circumstance seems to be the absence of any apparent reason for applying to tracts like 1, 22 and 32, in such an Addition as Laurel Place, the same restrictions upon use which are applied to the very much smaller and less valuable fifty foot lots. In addition to these matters, defendant has referred to the conduct of the Gaertners showing that they claimed the right to deal with tracts 1, 22 and 32 in a way different from that in which they have dealt with the 50 foot lots, and defendant has also referred to the acquiescence in the Gaertners' conduct by other owners of property in the Addition.

Defendant emphasizes as a rule of construction the rule that ambiguities in covenants restricting the use of land should be resolved in favor of the free use of the land.

In the alternative, defendant says, in effect, that if the restrictions do apply to tract 22, then they will have to be applied literally (which means that only one dwelling could be erected on tract 22) ; that no authority to subdivide tract 22 is conferred by the declaration of restrictions; that a literal application of the covenants would substantially deprive defendant of the value of tract 22, since no business could be conducted upon that tract and only one dwelling could be erected and maintained upon it, and that such a consequence requires that restrictions 1 and 6, so construed, be declared void as to said defendant and enforcement thereof denied.

Plaintiffs' arguments in reply emphasize the language of the instrument declaring restrictions which refers to "a general plan and building scheme uniform over the entire Addition—for the protection of all owners of any lot or lots in said Addition hereafter." Plaintiffs argue, too, that defendant Green Avenue Apartments had a right to subdivide tract 22, as tract 32 had been subdivided, and regarding Point 4, they argue that the evidence sustains the trial court's finding that defendant's use of tract 22 would amount to "a business."

On the grounds hereinafter stated, the order of the trial court is affirmed:

(1) The issues made by the parties require an interpretation of the instrument declaring the restrictions, dated May 31, 1939; and in interpreting this paper we have kept in mind the following rules, taken from the Revised Edition of Williston on Contracts but which may be put to use here. It should be noted that the quotations emphasize the significance to be given the purpose expressed by the parties.

"Sec. 618—*Primary Rules of Interpretation.*—

■■ "The writing will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose. The context and subject matter of a contract may show that in a particular sentence an ordinary word has **an unusual** meaning; or that a

word whose meaning, taken by itself, is clear, has been accurately used. In general, a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons. Noscitur a Sociis is an old maxim which summarizes the rule both of language and of law that the meaning of words may be indicated or controlled by those with which they are associated."

■ "Sec. 619—*Secondary rules: The main purpose of the instrument will be given effect.* (Secondary rules of interpretation are to be used when the primary rules have not satisfactorily shown the intent of the parties)—The court will if possible give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable; and if this is impossible, an interpretation which gives effect to the main apparent purpose of the contract will be favored.— The freedom of interpretation permissible is, however, necessarily limited by the principle that unexpressed intention is of no legal effect. The reason for interpolating, omitting, or disregarding specific words is that in the remainder of the writing an intention is expressed which makes it evident that particular words were erroneously used."

■ "Sec. 620—*Secondary Rules: The writing will be interpreted if possible so that it shall be effective and reasonable.* —An interpretation which renders the contract or agreement valid and its performance possible will be preferred to one which makes it void or its performance impossible or meaningless; an interpretation which makes the contract or agreement fair and reasonable will be preferred to one which leads to harsh and unreasonable results."

■ With these statements, we have also kept in mind the rule that ambiguities of statement should be resolved against the claim of a restriction upon the use of land. However, this rule is consistent with a limitation of the scope of a restriction, as distinguished from the total abatement of the restriction, and it should not imply at the present time a hostile attitude toward covenants restricting the use of land in such a residential subdivision as Laurel Place is. Without such restrictions, residential areas could not exist in modern cities; and reasonable restrictions, reasonably employed, are more apt to enhance the value of urban property than to depress it. The demand of urban dwellers for restricted property on which to dwell, and the wide development of a market to supply this demand, have been noted and commented upon by text writers. See: Clark's Covenants and Interests running with Land, 2nd Ed., p. 170; and Tiffany on Real Property, 3rd Ed., Vol. 3, p. 471, Sec. 858. The utility and demand for restricted property is reflected in the widespread use of the power to divide cities into zones, devoted to residential or to commercial uses, or to combinations of such uses.

It is a consequence that the rule of construction, resolving ambiguities against restrictions claimed, ought to be applied with due regard for the purpose expressed in the declarations of restrictions, and that this rule must not be applied so as to prevent the accomplishment of this purpose. We think that the quotation hereinafter made from the opinion of the Court of Appeals of Kentucky in Connor v. Clemons, 308 Ky. 9, 213 S.W.2d 438, is a statement of this rule of construction sufficiently complete for the purposes of this appeal, and that this quotation is supported by the opinions of the Courts of Civil Appeals in Green v. Gerner, 283 S.W. 615, judgment affirmed Tex.Com.App., 289 S.W. 999, and Fischer v. Reissig, Tex.Civ.App., 143 S.W. 2d 130, and the opinion of the Commission in Baker v. Henderson, 137 Tex. 266, 153 S.W.2d 465 (although the quotation from Thompson made by the Commission seems inconsistent with the present utility and the actual market value of restrictions limiting the use of land in cities to residential purposes). The question before the Kentucky court was whether certain restrictions prohibited the erection of a church. One restriction prohibited "The erection of any building or structure to be used for business purposes", and the other restriction

provided that "Not more than one structure * * * for residential purposes shall be erected on any one lot". [308 Ky. 9, 213 S.W.2d 439.] The Court thought that the second restriction would have excluded the church had it been the only restriction, but the addition of the first restriction, referring to structures for business purposes, indicated an intention to reduce the scope of the second restriction and to exclude only such structures as were used for business purposes. The question of interpretation was held to be a doubtful one, and for that reason, it was resolved against the restriction claimed. But the Court made the following statement which seems relevant here and which we think consistent with a summary of the conclusions reached in the three Texas decisions listed above:

"The judgment in the present case was entered before the publication of our decision in Dorsey v. Fishermen's Wharf Realty Co., 306 Ky. 445, 207 S.W.2d 565, 566 (rehearing denied February 13, 1948). That case is in some respects similar to the one we have here. The principal restriction, referring to lots, provided:

" '(3) That only one dwelling house shall be placed on the same (except servants' quarters), and that the cost thereof, over and above the cost of the lot shall be not less than $6,000.00, and that the exterior construction thereof shall be of stone, brick, log, concrete or stucco, with slate, tile, asbestos shingle, or asphalt shingle roof.'

"In deciding that the restriction meant that the lots should be used for residential purposes only, we gave to it the effect obviously intended by the parties. We recognized that building restrictions have in recent years come into general use, and the rule of strict construction which originated in controversies between a grantor and his grantee, where there was doubt concerning the extent of the estate conveyed, should not be used to defeat the dominant and apparent intention of the grantor. We applied the principle stated in Glenmore Distilleries Co. v. Fiorella, 273 Ky. 549, 117 S.W.2d 173, to the effect that the strict construction rule should not be invoked where the intention of the parties could clearly be determined from the language used in the light of surrounding circumstances and conditions.

"We believe the modern rule, based upon our more recent decisions and the decisions of other jurisdictions, is that the strict construction rule should not be used to defeat the obvious intention of the parties though not precisely expressed, but will be applied when ambiguous language creates a doubt as to what was prohibited. In the case of doubtful meaning, the restriction should be construed in favor of the free use of property and against the limitations. See 26 C.J.S., Deeds, § 163, page 513; and 14 Am.Jur., Covenants, Conditions and Restrictions, Sections 211 and 212."

█ One further matter: The meaning of the instrument dated May 31, 1939 is to be determined as of the date of that instrument and not as of some subsequent date.

(2) A declaration of purpose appears in the paper under consideration, and this, according to its terms, applied to the entire Addition, including tract 22, and purported to be for the benefit of *all* owners of property in the Addition.

Mr. and Mrs. Gaertner, in this paper, first identified the tract of land constituting the subdivision and then stated that they had "caused the same to be surveyed, subdivided, platted and laid out into lots, streets, and avenues, and public highways as shown upon the accompanying map for the purpose of establishing a subdivision which shall be known as Laurel Place Addition—." A reference to the plat and to the title written thereon is enough to show that tract 22 was a part of the "subdivision—known as Laurel Place Addition."

The language quoted was followed by a paragraph dedicating public highways, and following this is a paragraph beginning with these words: "for the purpose of establishing and maintaining a general plan and building scheme uniform over the entire Addition herein created for the protection and benefit of all owners of any lot or lots in said Addition hereafter," and following this language appear the elements of this plan. The language last quoted does not require interpretation. The "general

plan and building scheme" necessarily applied to tract 22 because tract 22 was a part of "the entire Addition" to which the "plan and—scheme" was to apply. Further, this "plan and—scheme" is for the benefit of plaintiffs because plaintiffs are "owners of—lots in said Addition hereafter." These "owners" were not divided into groups but were treated as one class, which included all persons owning land in Laurel Place Addition.

(3) Of course, the purpose to establish a "general plan and building scheme" for "the protection and benefit of all owners" would not have been accomplished by Mr. and Mrs. Gaertner unless they also stated the elements of the plan and made some expression putting this plan into effect; and necessarily their statement and expression had to be as broad as the purpose mentioned. Otherwise, this purpose would have failed for lack of machinery to execute it. Such description of a general plan as was made by Mr. and Mrs. Gaertner followed immediately after the statement of their general purpose.

First to be noted is that Mr. and Mrs. Gaertner expressly declared that the *plan* described was the *means* whereby their *general purpose* was to be *accomplished.* A transposition of words shows this very forcibly. Thus, they said: "I—charge each and all—lots in said Addition, as shown upon said map, and—establish the following as—restrictions upon the use, occupancy, and sale of any such lot or lots, for the purpose of establishing and maintaining a general plan and building scheme uniform over the entire Addition—for the protection and benefit of all owners of any lot or lots."

Next to be noted is that the restrictions are referred to in this language as a unit and not as two or more groups having different geographical scope. Thus, all of the restrictions are charged upon each "lot".

So far, no difficulty appears. The word "lot" was never defined by Mr. and Mrs. Gaertner, but the numbering of each tract on the plat and the use of consecutive numbers indicate that each tract so numbered was a "lot" and that the language quoted applied to every lot marked upon the tract and not to some only of these tracts.

The next thing to be noted, however, is that the first four restrictions seem inappropriate to three of the tracts shown on the plat, namely, 1, 22 and 32, although they are appropriate to the other 29 lots. Thus restriction 1 limiting the use of a lot to "one dwelling house with the necessary outhouses" seems inconsistent with any reasonable use of tract 22, which covered 5.07 acres when the restrictions were declared, or of tracts 1 and 32, which covered .98 acres and 1.01 acres respectively. Restriction 1, however, is appropriate to the 29 lots only 50 feet wide. Restriction 2 contains a requirement that the "dwelling house" front in the direction of the site, and another requirement that no building shall be erected less than five feet from either side of an adjoining lot. What is the direction of tracts 1 and 32? Why establish a five foot building line on tracts as large as tracts 1, 22 and 32? Both provisions of restriction 2, however, can be applied to each of the 50 foot lots without difficulty and plainly seem adapted to a reasonable use of these lots for residential purposes. Restriction 3 fixes the minimum value of the "main dwelling house to be erected" at $2,000 and this sum indicates that Mr. and Mrs. Gaertner expected the subdivision to be occupied by relatively small and inexpensive homes. This suggestion is strengthened by the price for which Mrs. Gaertner promised to sell three lots (Nos. 8, 9 and 10) to Myers; the total price was $1200, or an average price of $400 per lot. Tracts 1, 22 and 32 were much larger then the 50 foot lots and must have had a much greater value than these 50 foot lots. Such properties would not be in demand by purchasers who could be expected to buy and improve the 50 foot lots. Restriction 4 providing a public utility easement, can be fitted easily upon the 50 foot lots and upon tract 1, but how should it be fitted upon tract 32? It seems inconsistent with the shape and size of tract 22.

Consideration of restriction 6 with these comments in mind convinces us that restrictions 1, 2, 3 and 4 were never intended by Mr. and Mrs. Gaertner to apply to tract 22 as a single body of land in the way and manner in which said restrictions were intended to apply to the 29 fifty foot lots, and

therefore, not to tracts 1 and 32 considered as single bodies of land; and restriction 6 must be so considered. True, restriction 6 when considered alone may be as easily applied to tracts 1, 22 and 32 as the 50 foot lots and the difficulties encountered in applying the first four restrictions do not attach to restriction 6; but as we have pointed out, the expressions of intent made by Mr. and Mrs. Gaertner refer to and affix the 6 restrictions as a unit, not as two groups with different geographical scope, and restriction 6 ought, therefore, to be considered with the first four restrictions in determining whether any of them apply. The consequence is that Mr. and Mrs. Gaertner could not use tracts 1, 22 and 32 for business purposes (because of restriction 6) and could only erect on each of these three large tracts "one dwelling house with the necessary outhouses" (because of restriction 1). This construction would cause the Gaertners serious loss because Tracts 1, 22 and 32 covered more than one-half of the area of the entire Addition and would be inconsistent with the only reason apparent for their making a subdivision. The purpose of the subdivision was to create, not to destroy, salable property. Mr. and Mrs. Gaertner evidently thought that the subdivision would enable them to sell their land and realize its value, and the subdivision must have represented an effort on their part to accomplish that end. But in a small urban subdivision intended for small and inexpensive homes (and Laurel Place is this kind of a subdivision) no market demand could have been expected by Mr. and Mrs. Gaertner for the purchase, under such restrictions, of tracts as large as tracts 1, 22 and 32, except, perhaps, at prices comparable to those for which the very much smaller 50 foot lots were sold. We have pointed out in the preliminary statement that tracts 1, 22 and 32 were not impressed with any public use. The declaration of purpose states that the restrictions were imposed for the benefit of all lot owners; the construction postulated would burden tracts 1, 22 and 32 without any benefit in return and would in effect create two classes of owners instead of the single class of owners which Mr. and Mrs. Gaertner declared to be protected by the restrictions.

■ The word "lot" has no fixed meaning and the meaning to be assigned to it must be extracted from the context and the circumstances. We have concluded, therefore, that when Mr. and Mrs. Gaertner declared the restrictions in the paper of 1939, they intended the restrictions to be immediately effective only upon the 29 lots fifty feet wide and did not then intend these restrictions to be immediately effective, in the same way, upon tracts 1, 22 and 32. This construction accords with the popular notion of an urban "lot", which the defendant Green Avenue Apartments has emphasized in its arguments. It also may be said to resolve a doubt against a restriction and in favor of a freer use of land. Furthermore, it also gives some significance to the word "sold", which appears in restriction 1. That restriction provided a limitation upon the use of a lot "when sold". The word "sold" suggests that Mr. and Mrs. Gaertner had in mind such lots as were *then proper to be sold* or as they might *then expect to sell,* and the 50 foot lots were the only ones of this sort which were *marked on the map.*

(4) The conclusion that the restrictions were put into immediate effect upon only the 29 fifty foot lots takes more than one-half of the Addition out from under the immediate operation of the restrictions and this consequence brings us to the question, whether Mr. and Mrs. Gaertner made an expression of intent in the instrument of 1939 which would put the restrictions into active operation upon tracts 1, 22 and 32 at some time in the future. It is at this point that the parties' arguments concerning Mr. and Mrs. Gaertner's right, or not, to subdivide tracts 1, 22 and 32 become relevant. As we have noted, defendant Green Avenue Apartments argues that the instrument of 1939 did not authorize a subdivision of tracts 1, 22 and 32 while the plaintiffs argue that it did confer such a right upon Mr. and Mrs. Gaertner.

There is authority for the proposition that a subdivision of tracts 1, 22 and 32 could have been made without an express reservation of authority so to do, unless the contrary had been promised by Mr. and Mrs. Gaertner, or such a future subdivision

would have been inconsistent with the execution of some restriction. See: Hickson v. Noroton Manor, 118 Conn. 180, 171 A. 31; Farquharson v. Scoble, 38 Cal.App. 680, 177 P. 310. Our holding that the restrictions were immediately put into active operation upon only the 50 foot lots has eliminated the possibility that Mr. and Mrs. Gaertner promised not to make a future subdivision (the possibility would otherwise have arisen under the terms of restriction 1), and it is evident that a subdivision of tracts 1, 22 and 32 could have been made which would be consistent with the restrictions and would not have defeated or limited the application of these restrictions.

However, we think that Mr. and Mrs. Gaertner actually expressed an intention to subdivide tracts 1, 22 and 32 and that they also made a promise that the several restrictions would apply to the lots created by this future subdivision. Let us refer again to the declaration of purpose as follows: "for the purpose of establishing and maintaining a *general* plan and building scheme *uniform* over the *entire addition*—for the protection and benefit of *all* owners of any *lot or lots* in said addition *hereafter*." This language, as we have stated, plainly includes tracts 1, 22 and 32 because those tracts are a part of the "entire addition" referred to. Such a construction gives "lot or lots" a broader and more general meaning then the restricted meaning we have given the same words in the several restrictions, but as the quotation from Williston shows, the same word may be given different meanings in the same paper if the context shows that it was actually used in different senses, and the language just quoted shows that "lot or lots" did not refer only to the 29 fifty foot lots marked on the plat of 1939.

Let us now go to the foot of the restrictions. There, following immediately after restriction 6, appears the following: "We, the said grantors herein, the present owners of said land and all of the lots into which the same shall be subdivided and shown upon the accompanying map, do hereby declare that any and all deeds by us hereafter made conveying any lot in the Addition herein created shall by refer-

ence to the accompanying plat and this dedication adopt and declare the—foregoing—restrictions as a part of the consideration for such conveyance or conveyances."
(a) A promise that the restrictions shall apply to each lot sold is clearly expressed in this language. (Our description of Myers' contract and deed shows a compliance with this promise, in terms calculated to induce a belief on his part that the restrictions would cover the entire addition.)
(b) The expression of an intention to make a future subdivision of some part of this addition is made by the words "said land and all of the lots into which the same shall be subdivided and shown upon the accompanying map." Why refer to lots into which the "land—shall be subdivided" unless a future subdivision was intended? These words, having been used, ought to be given some significance. Had Mr. and Mrs. Gaertner meant to refer only to the tracts marked upon the plat, the words "shall be subdivided" need not have been used—because of the words "shown upon the accompanying map." The phrase under consideration should be read as if it were as follows: "Said land and all of the lots into which the same shall be subdivided and (all of the lots) shown upon the accompanying map." The phrase actually written is incomplete but the meaning seems clear; Mr. and Mrs. Gaertner were referring to lots marked upon the plat and also to lots which would be made in the future.

The conclusion that some future subdivision was intended and that the restrictions would apply to the new lots thus made is supported by the following matters:

(a) It effectuates the purpose expressed by Mr. and Mrs. Gaertner to create a "general plan and building scheme uniform over the entire addition" and it effectuates their purpose that this plan should be "for the protection and benefit of *all* owners," instead of only the persons owning either the 50 foot lots or the persons owning tracts 1, 22 and 32. Thus tracts 1, 22 and 32 would not be unduly burdened in favor of the 50 foot lots and on the other hand, the 29 fifty foot lots would not be burdened in favor of other parts of the Addition freed of any restrictions. Without the construc-

tion we have made, precisely the opposite would occur.

For if the restrictions are not to be applied in some way and at some time to tracts 1, 22 and 32, then the "general plan and building scheme" would have totally failed of accomplishment, and the restrictions would not be "for the protection and benefit of all owners of any lot or lots in said Addition hereafter." The result would bear as heavily upon the owners of the 50 foot lots as the contrary construction, affixing the restrictions, literally construed, upon tracts 1, 22 and 32 would bear upon the owners of those three tracts. For the restrictions would burden the 50 foot lots instead of protecting them and would, in effect, add something to the value of tracts 1, 22 and 32. The extent to which the "general plan and building scheme" would have failed is apparent upon a casual examination of the plat. The 29 fifty foot lots are arranged in the shape of an inverted "L", with the bar of the "L" running squarely through the remainder of the Addition; tracts 1 and 32 adjoin the bar on the west and the bar constitutes the western and southern boundaries of tract 22. If tracts 1, 22 and 32 are freed from any restrictions, then on the date the restrictions were declared, tracts 1, 22 and 32 could have been used for any lawful purpose, either commercial or residential, and the 29 fifty foot lots, in effect would not have been a restricted area—if the benefits to the owners of the fifty foot lots be considered. The restrictions would burden the fifty foot lots by restricting their use and this burden would benefit tracts 1, 22 and 32 because these tracts could be used for purposes for which the fifty foot lots could not be used.

(b) Our conclusion also is in accord with, and gives some meaning to, Mr. and Mrs. Gaertner's statement that the restrictions were made "for the purpose of establishing and maintaining," that is, to put the general plan into effect.

(c) Our construction also is in accord with and explains the conduct of Mrs. Rosa Gaertner in subdividing tract 32, and is in accord with and explains Gant's understanding of what was to be done with tract 22.

(d) Finally, our construction enables the owners of tracts 1, 22 and 32 to realize the market value of their properties for residential purposes.

■ (5) These conclusions also necessarily imply that a *failure* to subdivide tracts 1, 22 and 32 could not be used as a subterfuge to remove these tracts from under the operation of the restriction. Mr. and Mrs. Gaertner, having stated that the restrictions were intended to cover the entire Addition and were for the benefit of all owners of lots in that Addition, and having promised that the restrictions would apply on lots made by future subdivision, would not be permitted to defeat their purpose and their promise by defeating their restrictions, doing indirectly what they could not do directly, by devoting tracts 1, 22 and 32 to a use as a solid tract which would be inconsistent with the use to which that tract would have to be devoted if it were subdivided. This limitation upon the rights of Mr. and Mrs. Gaertner would also apply to their grantees.

The expression of intent that the restrictions should apply in the future to tracts 1, 22 and 32, is a covenant running with the land.

(6) The conclusion that Mr. and Mrs. Gaertner had the right under the instrument of 1939 to subdivide tracts 1, 22 and 32, and that the restrictions would apply to the new lots thus created, when these lots were created, requires a determination of what the relevant restrictions mean, and of how the same are to be applied to tract 22 before the same is subdivided.

The relevant restrictions are 1 and 6.

For reasons just stated, no significance need be given the fact that tract 22 has not been subdivided, because the restrictions could not be circumvented by a failure to subdivide tracts 1, 22 and 32, and a comparison may be made between the use planned by defendant with its evident effects, and the operation which these restrictions could reasonably be expected to have if tract 22 were subdivided.

Restriction 1, as we have stated, has been construed by the trial court as limiting the use of each lot to a dwelling suitable for the residence of only a single family. This construction seems in accord with the small size of the fifty foot lots, the relatively low price at which these fifty foot lots were sold, and the relatively low minimum restrictions on the cost of the dwelling to be erected. There is authority to the contrary but the trial court's construction is supported by the decisions in Green v. Gerner; Fischer v. Reissig and Connor v. Clemons, supra.

However, is is really unnecessary to go so far in construing restriction 1. If restriction 1 does permit multiple dwellings, it would still forbid the erection of more than one such dwelling upon each lot, and although tract 22 has not been subdivided, the trial court would have been justified in assuming that tract 22, in its present form, probably could not have been profitably cut up into the 21 lots which would be required for the 21 dwellings defendant plans to erect. In other words, the trial court would have been authorized to find from the evidence that the use planned by defendant would materially exceed in degree the use permitted by restriction 1. This conduct would be a violation of restriction 1. See: Morrison v. Hess, Mo.Sup., 231 S.W. 997, 18 A.L.R. 433.

Restriction 6 is next to be considered. If restriction 1 limits each lot to a single family dwelling, then it would have excluded and forbidden the erection of multiple dwellings for rental to the public and the word "business" in restriction 6 should be limited to commercial pursuits such as those which the words "shop", "store", "industries", and "trade", also used in restriction 6, refer to. However, if restriction 1 should not be construed as prohibiting multiple dwellings for rental to the public, then the meaning of "business" in restriction 6 should be considered from another vantage point, namely, the purpose which then must be assigned to it, and with this must be considered the consequences of the commercial pursuits which restriction 6 unquestionably does prohibit. The purpose which ought to be assigned to restriction 6, if restriction 1 permits a multiple dwelling, is a purpose to exclude such pursuits as might be referred to by the word "business" and as would be attended by the same consequences to the residential character of the addition as would attend "shops", and the other commercial pursuits plainly mentioned in restriction 6. The maxims *ejusdem generis* and *noscitur a sociis* are guides to the ascertainment of the parties' intentions; they must be applied, or not, with due regard for the effect of the entire instrument and not with regard to restriction 6 alone.

The proof shows that defendant Green Avenue Apartments plans to house 62 families, with 62 garages for the tenants' automobiles, on tract 22. A consideration of the size and shape of tract 22 in its present form, with the low sales price of the 50 foot lots, indicated that tract 22 probably could not profitably be subdivided into more than 18 lots, if that many; this subdivision probably would result in creating rather small lots, but it would be consistent with Gant's understanding that tract 22 was to be divided into 90 foot lots. Tract 22, being 810 feet long, could be divided lengthwise into 9 lots 90 feet wide, and a street parallel to Green Avenue could be run through the tract, thus doubling the number of 90 foot lots. At any rate, if 18 lots be taken as the probable maximum number which could profitably be cut out of tract 22, then under restriction 1, 18 dwellings could be erected to house the 62 families which defendant Green Avenue Apartments expects to occupy tract 22. The erection of 18 such dwellings, at one time, on tract 22 in its present size and shape, located with reference to the balance of the Addition as tract 22 now is, would result in a complete change, at one time, of the character of Laurel Place Addition. Such an improvement of tract 22 would be a materially different thing from the erection of a duplex apartment or of a 4-unit apartment house on one of the 50 foot lots. Further, such an improvement of tract 22 would not be comparable to the erection of several such duplexes or 4-unit apartment houses in the Addition at inter-

692

vals over a period of time, for the first is the act of one person at one time which results in immediately destroying the value of the restrictive scheme while the other consists of several acts at different times by different persons, none of which is sufficient of itself to destroy the general restrictive scheme. The distinction is between an act which does affect the entire scheme, and unrelated acts, none of which alone does any such thing. It might therefore be said that one is wrongful and the other is rightful.

■ The use which defendant Green Avenue Apartments· expects to make of tract 22 would be residential in one sense of that term but it would also be attended by consequences which attach to "stores", "shops", "trade" and "industry" and which, in fact, would be more inconvenient and unpleasant to the inhabitants of the balance of the Addition than would one or two such shops. Such a use as defendant intends to make would be attended by a great increase in traffic, (we have mentioned the fact that Green Avenue is the only means of access to the properties of plaintiffs and of the defendant Green Avenue Apartments) in the number of people, in the number of children and pets, and in the noises and distractions which seem invariably to accompany the presence of such a large number of people as defendant intends to put upon such a small area. These circumstances would have justified the trial court in classifying defendant's apartments with "stores" and the other commercial uses referred to in restriction 6, because the consequences of defendant's use would be like those of the prohibited commercial uses. The excessive increase at one time in the degree and the extent of use, bringing with it the same consequences which attach to the forbidden commercial uses, ought to be enough to take these multiple dwellings planned by defendant out of the "residential" class and put them into the same class with the "shops" and other commercial uses. See: Wood v. Blancke, 304 Mich. 283, 8 N.W.2d 67. Whether the consequences of defendant's use is substantially equivalent to the consequences of the pro-

hibited commercial use is a question of fact, and the proof is sufficient to support a finding of equivalence, on this sort of appeal. Having gotten thus far, it is proper to refer to the fact that defendant Green Avenue Apartments' business will be the rental of these 62 apartments to the public, that this is to be done for profit, and that from said defendant's standpoint the undertaking would be of as much a commercial character as would be the operation of a "store".

(7) The use of tract 22 which defendant Green Avenue Apartments plans to make would substantially defeat the operation of restrictions 1 and 6, and it was therefore subject to restraint by injunction.

From the evidence, the trial court could have concluded that on the trial of the merits the plaintiffs probably would be able to prove the existence of a right and to prove a breach of this right entitling them to a permanent injunction, and the order appealed from is therefore affirmed.