**SOUTHLAND ROYALTY COMPANY et al., Petitioners.**

v.

**PAN AMERICAN PETROLEUM CORPORATION et al., Respondents.**

**No. A–8940.**

Supreme Court of Texas.

Jan. 29, 1964.

Rehearing Denied April 29, 1964.

R. M. Coleman, Fort Worth, Jackson, Walker, Winstead, Cantwell & Miller, Kilgore & Kilgore, Dallas, Stubbeman, McRae, Sealy & Laughlin, Midland, Charles B. Wallace, Dallas, Jack Vickrey, Midland, for petitioners.

Turner, Rodgers, Winn, Scurlock & Terry, Dallas, J. K. Smith, Fort Worth, Richard C. Milstead, Kermit, L. A. Thompson, Tulsa, Okl., for respondents...

HAMILTON, Justice.

On motion for rehearing the majority opinion is withdrawn and this opinion is substituted therefor. Also the dissenting opinion filed heretofore is withdrawn.

This case involves the construction of a mineral lease. The petitioners, Southland Royalty Company, Avoca Corporation and Socony Mobil Oil Company, Inc., each filed suit in the district court of Winkler County against respondents, Pan American Petroleum Corporation and Westbrook-Thompson Holding Corporation, alleging they were owners of certain royalty interests in lands covered by a mineral lease and seeking to recover of the respondents, owners of the mineral lease, their pro rata part of one-eighth of the proceeds of the minerals produced from the land under which they held their royalty interests. Both petitioners and respondent filed mo-

tions for summary judgment. The trial court denied the motion of petitioners and granted that of the respondents. The Court of Civil Appeals has affirmed the trial court judgment. 354 S.W.2d 184. On appeal to this court the judgments of the Court of Civil Appeals and trial court are reversed.

In 1925 H. G. Hendrick and wife Ida Hendrick leased to J. W. Grant 10,240 acres of land in Winkler County for the purpose of mining and operating for oil, gas, potash and other minerals, subject to certain covenants. We will quote the pertinent parts of said lease:

"* * * do grant, lease and let unto the said lessee for the sole and only purpose of mining and operating for oil and gas *potash or other minerals* * * *.

"It is agreed that this lease shall remain in force for a term of 20 years from this date, and as long thereafter as oil or gas, *potash or other minerals* or either of them is produced from said land by the lessee.

"In consideration of the premises the said lessee covenants and agrees:

"1st. To deliver to the credit of lessor, free of cost, in the pipe line to which they may connect their wells, the equal one-eighth part of all oil produced and saved from the leased premises *and ⅛ of the net proceeds of potash and other minerals at the mine*.

"2d. To pay the lessor One Hundred Dollars, each year in advance for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the time by making their own connections with the well at their own risk and expense.

"3rd. To pay lessor for gas produced from any oil well and used off

the premises at the rate of Fifty and No/100 Dollars per year for the time during which such gas shall be used, said payments to be made each three months in advance.

*       *       *       *       *       *

"Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for all operations thereon, except water wells of lessor."

This lease is on a printed form in which the blanks have been filled in with a typewriter and certain interlineations made in longhand on the printed portions thereof. The interlineations in the quoted part above are italicized. The respondents are the present owners of the lease in so far as it covers three-fourths of a section of land (480 acres) of the 10,240 acres included therein, and petitioners are the owners of varying mineral interests in the lands covered by the lease, including the 480 acres of land which is involved in this lawsuit.

Following the execution of the lease in 1925 oil was discovered in the area in 1926. In 1927 production of oil was obtained from the respondents' portion of the leased premises. Thereafter a number of oil wells were completed on respondents' portion of the lease at depths ranging from 2800 to 3800 feet. From these oil wells some gas was produced. Later on some of the wells quit producing oil and produced only gas. Respondents and their predecessors in title were the owners of substantial portions of another lease identified in the record as the Ida Hendrick lease, which covered some 21,000 acres of land, and on which respondents had many producing wells. Gas was taken from the wells on petitioners' land by means of pipe lines to the other leases of respondents furnishing gas as fuel for boilers, machine shops, garages and the operation of camps. The record reflects that the gas taken from wells producing oil was paid for by respondents on the basis of $50.00 per well per year when used off the premises, and the gas from wells producing gas only was paid for by respondents on the

basis of $100 per well per year when used off the premises, and that such payments had been accepted by petitioners and their predecessors in title for practically 32 consecutive years before the filing of this suit in 1959. From time to time it was shown that respondents sold gas to other operators in the field for use in developing their premises. In 1949 respondents made a contract with C. V. Lyman to sell gas produced from shallow wells to be used in his gasoline plant, located off the Hendrick lease. Lyman obtained the gas by connecting on to some of the same wells of respondents from which they were using gas to develop others of their leases. Petitioners were not notified of such sales, nor did the respondents pay petitioners ⅛ of the proceeds of such sales. It is undisputed that the petitioners had no knowledge of any such sales.

Respondents drilled a deep gas well on petitioners' portion of the T. J. Hendrick lease in 1956 which produced gas only. They began selling the gas from this well in 1958. Two other deep gas wells were completed, one in 1958 and one in early 1959, from which respondents began selling gas. Petitioners learned of such sales shortly before filing this suit in 1959, at which time respondents were selling gas from these three wells at the rate of more than a million dollars' worth per year.

Petitioners contend that respondents are obligated to them for the payment of ⅛ of the proceeds of the sale of gas from their portion of the premises covered by the lease as provided in the first royalty clause therein. Respondents contend that they are only obligated to pay for gas used or sold under the provisions of paragraphs 2 and 3, contending that the first royalty provision does not provide for royalty on gas. The Court of Civil Appeals has held that the first royalty provision does not provide for the payment of royalty on gas, and that respondents are liable only under 2 and 3.

We agree with the Court of Civil Appeals that in construing a contract all the provisions thereof must be construed together in order to arrive at the true intent of the parties. We think the orderly manner of proceeding, though, is to start at the beginning of the contract and take up the pertinent provisions as they come, and when we analyze each one of them then look at the matter as a whole and try to arrive at the proper construction to be placed on the whole contract.

There is no controversy over the granting clause. It was a lease or a conveyance of oil, gas, potash and other minerals for the sole and only purpose of mining and operating for those minerals. Neither is there any dispute over the term provision. The right to produce, use and sell said minerals, however, is subject to certain covenants. The lease provides "In consideration of the premises the said lessee covenants and agrees:" Then follows three paragraphs numbered 1st, 2nd and 3rd. The first paragraph provides for a ⅛ royalty on the oil and ⅛ of the net proceeds of potash and other minerals at the mine. The second and third paragraphs provide for a flat-rate royalty to be paid on gas used off the premises. The parties disagree on the construction to be given these three royalty provisions.

The principal questions before us are, first, whether or not the term "other minerals" in the context in which it is used in the first royalty paragraph includes gas. Second, if it does include gas, is this royalty provision repugnant to the second and third royalty provisions which provide for a flat-rate royalty for gas used off the premises? In answering the second question we must determine if the term "gas used off the premises" means gas *sold* for use off the premises.

In construing the first royalty provision we note that it provides for ⅛ of the net proceeds of potash and other minerals at the mine. We think there is no question raised but that the "proceeds of potash and other minerals" means net pro-

ceeds from the sale of potash and other minerals. We also think there is no serious question raised but that the words "mineral" or "minerals" include gas. This is well settled in our law, as is shown by the following cases:

Luse v. Boatman, 217 S.W. 1096 (Tex. Civ.App.), error refused, where the deed reserved "all the coal and mineral on and in the above-described land". Luse v. Parmer, 221 S.W. 1031 (Tex.Civ.App.), error refused, which involved the identical deed.

Donnell v. Otts, 230 S.W. 864 (Tex.Civ. App.), no writ history, which involved a reservation of "all minerals of all and any kind (except stone coal)."

Elliott v. Nelson, 113 Tex. 62; 251 S.W. 501, in which the reservation was of "all minerals in, upon and under the said land".

Warner v. Patton, 19 S.W.2d 1111 (Tex. Civ.App.), error refused, which was a reservation of "all the mines, minerals, and mineral rights whatsoever that may be with, upon, or under said tract".

Rio Bravo Oil Company v. McEntire, 128 Tex. 124, 95 S.W.2d 381, 96 S.W.2d 1110, involving a reservation of "coal, mineral, stone, or any other valuable deposit".

Anderson & Kerr Drilling Company v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 127 A.L.R. 1217, involving a reservation of "½ interest in all Minerells Paint Rock &c. found or will be found on said described tract of land".

Branham v. Minear, 199 S.W.2d 841 (Tex.Civ.App.), writ refused, n. r. e., in which there was a reservation of "any mineral on said land".

Watkins v. Certain-Teed Products Corporation, 231 S.W.2d 981 (Tex.Civ.App.), involving a deed conveying "all of the gypsum, gypsum plaster and gypsum stone and all other minerals of any kind whatsoever".

Each of the above cases held without qualification that the particular deed or reservation quoted above using the word "minerals" included oil and gas.

We have concluded that the term "other minerals" as used in the first royalty provision includes gas. Referring back to the granting clause quoted above, the term "other minerals", being preceded by "oil, gas and potash", necessarily means other minerals than oil, gas and potash. The words have the same meaning in the term clause because there it is preceded by oil, gas and potash. In the first royalty clause the words "other minerals" is preceded only by the specifically named minerals, oil and potash, consequently the words as used in this sentence must mean minerals other than oil and potash. Gas is necessarily one of the minerals other than oil and potash. "Other minerals" used by itself could have no meaning. It only takes on meaning when used in connection with a certain specific mineral or minerals. Consequently, the term "other minerals" need not always have the same meaning in the same instrument. Its meaning is determined by the specifically named minerals with which it is used.

The Court of Civil Appeals has held that the words "other minerals" used in connection with the word "potash" could not be construed to cover gas, but must be construed to cover minerals of a like kind as potash. That court overlooks the fact that "other minerals" was preceded not only by "potash", but by "oil". But be that as it may, the doctrine of ejusdem generis as applied to minerals has never been accepted in this state. The reason for the reluctance of our courts to apply the doctrine is clearly stated by the Court of Civil Appeals in the case of Luse v. Boatman, supra. The most recent case on this subject by the Supreme Court of Texas is one of the cases cited above, Anderson & Kerr Drilling Company v. Bruhlmeyer, in which the court said:

"To the authorities last cited may be added the decisions above discussed which hold that a reservation of 'minerals' is sufficient as a matter of law to include oil and gas, although at the time the reservation was made coal or

other solid mineral had been produced in the community, or state, but oil and gas had not.

"From our conclusion that the deed by its terms plainly and clearly evidences the intention of the grantors to reserve all minerals, including oil and gas, it follows that it became the duty of the court to give the deed that construction without looking to the attending circumstances for explanation.

"We answer the first certified question as follows: The clause of exception and reservation contained in the deed excepts and reserves as a matter of law a fee simple title in the grantors in and to an undivided one-half interest in all oil and gas in and under the land conveyed by the deed, and such provision is not so ambiguous, or so lacking in definiteness, that its meaning requires proof or explanation." 136 S.W.2d p. 805, 127 A.L.R. 1217.

In the earlier case of Rio Bravo Oil Company v. McEntire, supra, the Supreme Court, in construing the words "coal, mineral, stone, or any other valuable deposit", said:

"The Court of Civil Appeals correctly held that the language used in the reservation of minerals in the contracts by which the railway company in 1882 sold the land to Kelley was sufficient as a matter of law to include oil and gas."

It should be noted that in the two Supreme Court cases, above cited, this court has said that the word "minerals" is to be construed to include oil and gas *as a matter of law*. These cases not only answer the holding of the Court of Civil Appeals in incorrectly applying the doctrine of *ejusdem generis* to a mineral conveyance, but they answer the Court of Civil Appeals opinion's holding that the royalty covenant above covered only those minerals which the parties *contemplated* might be produced from the premises. The quoted language

of the court's opinion in the Anderson & Kerr Drilling Company case shows that the court frowns upon the consideration of surrounding circumstances as an aid to construction because the word "minerals" includes oil and gas *as a matter of law* and is clear and unambiguous.

The only case cited by the Court of Civil Appeals in support of its position with reference to the application of the doctrine of *ejusdem generis* is Right-of-Way Oil Co. v. Gladys City Oil, Gas & Manufacturing Co., 106 Tex. 94, 157 S.W. 737, 51 L.R.A., N.S., 268. This case involved a deed which conveyed to a railroad company (Right-of-Way's predecessor in title) "the right of way, two hundred feet in width, over and upon the above-described tract of land; together with the right to take and use all the timber, earth, stone and mineral existing or that may be found within the right of way hereby granted". Concerning this deed, the court said:

"The interest granted in the land is the right of way. What right did the railroad company acquire? As we have seen, by the use of the terms, 'right of way,' a 'grant of the right of way,' the company did not acquire the fee in the land. It got but an easement, * * *". 157 S.W. 739, 51 L.R.A.,N.S., 268.

Having found that the deed conveyed only a surface easement, the Supreme Court held that the minerals conveyed were limited to those at or near the surface, and the appurtenant minerals did not include oil and gas lying beneath the surface. What minerals were conveyed were for right of way purposes, not for mining purposes. This is quite different from holding that the word "mineral" in the right of way deed did not cover oil and gas under the doctrine of *ejusdem generis*.

■ The fact that the royalty provision in the case before us provides for proceeds of other minerals "at the mine" seems to have given the Court of Civil Appeals some concern, but since the grant is for the pur-

pose of mining and operating for gas, and since it is so well settled that an oil or gas well is a mine, it is thought that it is not necessary to discuss this matter. See Luse v. Boatman, 217 S.W. 1096, at pp. 1100–1101.

The Court of Civil Appeals has held as a matter of law that the second and third royalty provisions which provide for a flat rate per well to be paid on gas while "used off the premises" means gas "sold" to other parties. It reaches that conclusion on the authority of the holding in Harris v. Lone Star Gas Co., Tex.Civ.App., 19 S.W.2d 178, writ refused, 45 S.W.2d 664 (Tex.Civ. App.), writ refused (second appeal), which it says is in conflict with Reynolds v. Mc-Man Oil & Gas Co., Tex.Comm.App., 1928, 11 S.W.2d 778, opinion adopted by the Supreme Court. We do not agree that these cases are in conflict. When these cases are read in the light of the different fact situations involved, it is readily seen that there is no conflict. Both the Reynolds v. McMan Oil Company case and the Harris v. Lone Star Gas Company case had similar covenants as does the lease which we have before us.

The difference in the case before us and the two other cases is that the other two cases provided in the first covenant for ⅛ royalty only on oil, whereas the case before us provided for the royalty on oil and ⅛ of the proceeds of potash and other minerals. The difference in the Reynolds case and the Harris case is that the Reynolds case involved recovery of ⅛ royalty on gasoline produced from gas from an oil well and sold, whereas the Harris case involved recovery of royalty on gasoline produced from gas from a well producing gas only and sold. In the Reynolds case the court held that the gas coming from an oil well is subject to the ⅛ royalty payment as oil. The court further held with reference to the flat rate gas clause that "used" in this connection is not *necessarily* synonymous with "sold" or "disposed of", rather it is synonymous with "employed" or "consumed", and that the clause must be con-

strued in the light of other provisions of the lease, the implication being that since gas from an oil well was subject to payment of royalty as oil, the term "used off the premises" did not include "sold".

In the Harris case there was an alternative suit for the recovery of the payment under the flat rate gas payment clause, which was the same as our second covenant in this case. The trial court allowed recovery both under the ⅛ oil royalty clause and under the flat rate gas payment clause. The Court of Civil Appeals denied recovery under the oil royalty clause for the reasons above stated, but affirmed the trial court in allowing recovery on the flat rate gas covenant. There was no controversy on this matter. The proof showed there that the lessee had tendered the flat rate payment for each and every year sued for. The only controversy was whether or not the claim for payment under the flat rate gas covenant was barred by limitation. Both the trial court and the Court of Civil Appeals held that the claim for payment of the flat rate was not barred. Consequently this case does not support the Court of Civil Appeals in its holding that "used" as a matter of law is synonymous with "sold".

While we have concluded that the term "used" as employed in these flat rate gas clauses is not as a matter of law synonymous with "sold", we are not willing to say that the term "used" as employed in these clauses can never be construed as meaning "sold" or "disposed of". In fact, we have concluded that the term "used off the premises" is ambiguous. It could mean used off the premises by the lessee for purposes of developing other leases or it may mean used off the premises in many ways by third parties to whom lessee has assigned the right or sold the right. The clauses do not limit the manner of use. Since we have no way of knowing what the parties actually intended by the use of the term "used off the premises" in the second and third covenants, we must arrive at their intention as best we can by the application of standard rules of interpretation and construction.

We reject the theory of the respondents, adopted by the Court of Civil Appeals, that the parties themselves have answered the question by their own practical construction of the lease over a long period of time. The summary judgment proofs, detailed in the opinion of the Court of Civil Appeals, show, perhaps, that those claiming under the lessee construed the lease to require payment of the flat-rate royalties provided in the second and third royalty clauses on gas *sold* for use off the premises by others, but there are no proofs that those holding under the lessors so construed them. Application of the "construction-by-the-parties" rule can not be predicated upon evidence that one of the parties by the exercise of diligence *should have known* that the other was construing a contract in a particular manner. Before that rule may be used to ascertain the intention of the parties, the evidence must show that the practical construction was "deliberately given it by both parties." Galveston, H. & S. A. Ry. Co. v. Johnson, 74 Tex. 256, 11 S.W. 1113, 1116. The evidence before us is undisputed that those holding under the lessors did not know that the successors to the lessees were so construing the lease and were paying royalties accordingly. It is also undisputed that respondents have for more than thirty years been using gas off the land of petitioners in the development of their other leases in the area. The payment of the flat-rate royalties under paragraphs 2 and 3 of the lease during this time is entirely consistent with petitioners' contention that the payment of such royalties was not notice that respondents were selling gas.

It is our view that the question should be answered by the application of the rule of construction which requires a court to harmonize and thus to give meaning to all apparently conflicting provisions of a contract when this reasonably may be done.

■ On the face of the lease as finally written and executed by the parties there is a possible conflict between the first royalty clause and the second and third royalty clauses. The first royalty clause, as amended, imposes a clear legal obligation to pay royalty of ⅛th of the net proceeds on gas sold, including gas sold for use by others off the premises, and which in its second and third royalty clauses does not impose clear legal obligations to pay flat-rate royalties on gas sold for use by others off the premises but are ambiguous in that respect. If we construe the second and third clauses as imposing obligations to pay the flat-rate royalties while gas is being used off the premises by others to whom the gas is sold, as well as by the lessee, we either create an absolute repugnancy between the royalty clauses or we impose an obligation to pay both the percentage and the flat-rate royalties for gas sold. On the other hand, if we construe the second and third royalty clauses as imposing obligations to pay the flat-rate royalties only while gas is being used off the premises by the lessee, repugnancy is avoided. The obligation would be to pay the percentage royalty on gas sold and the flat-rate royalty on the gas used off the premises. Thus none of the clauses are nullified and all three clauses are given meaning and operative effect. Sound rules of construction require us so to construe them. Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617, 620; Benge v. Scharbauer, 152 Tex. 447, 259 S.W.2d 166, 167.

■ While there is no need here to resort to them, there are other secondary rules of construction for resolving apparent conflicts which, if applied, would lead to the same result. One is the rule which gives effect to written or typewritten provisions over printed provisions. McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341, 344. Another is the rule which gives effect to an earlier over a later provision. Benskin v. Barksdale, Tex.Com.App., 246 S.W. 360, 363; Williston on Contracts, Revised Edition, § 624.

■ The effect of our holding here is that a lease which contains a specific pro-

vision for the payment of royalty for gas sold and also contains a provision for the payment of royalty on a flat-rate basis for gas used off the premises, the term "used off the premises" does not include "sold for use off the premises". This holding is in harmony with this court's holding in Reynolds v. McMan Oil & Gas Company, supra, and is not in conflict with Harris v. Lone Star Gas Company, supra, as pointed out above. Neither is it in conflict with Humble Oil & Refining Company v. Poe, Tex.Com.App., 29 S.W.2d 1019, Mussellem v. Magnolia Petroleum Company, 107 Okl. 183, 231 P. 526, and Lackey v. Ohio Oil Company, 10th Cir., 138 F.2d 449, because in each of these cases the leases involved did not contain a specific provision for the payment of royalty on gas sold. The cases of Magnolia Petroleum Company v. Connellee, Tex.Com.App., 11 S.W.2d 158, on rehearing Tex.Com.App., 14 S.W.2d 1020, and Magnolia Petroleum Company v. Akin, Tex.Com.App., 11 S.W.2d 1113, relied on by respondents, are not in conflict with our opinion. The lease involved in each of these cases, after providing for royalty of ⅛ on oil and a flat-rate royalty to be paid on gas sold or used off the premises, provided as follows: "For all other minerals, ⅛ of the net profits thereof." In these cases recovery was sought for royalty on gas under the last provision on the theory it was a mineral. Recovery was properly denied, first, because specific provision was made for gas sold, and second, because the term "other minerals" used in the last royalty provision could only refer to minerals other than oil and gas.

Petitioners' *motion* for rehearing is granted, the judgment heretofore rendered and entered is set aside, and the judgments of the District Court and the Court of Civil Appeals are reversed and the cause is remanded to the District Court for further proceedings in accordance with this opinion.

GRIFFIN, WALKER and NORVELL, JJ., dissenting.

CALVERT, Chief Justice (concurring).

Courts try to solve disputes over the *meaning* of contracts by giving them the meaning the parties intended them to have. This is as it should be. But what meaning the parties to a contract *intended* it to have is often unclear. Once a dispute arises over meaning, it can hardly be expected that the parties will agree on what meaning was intended. It is for this reason that the courts have built up a system of rules of interpretation and construction to arrive at meaning, ignoring testimony of subjective intent.

"*Intention* of the parties" is often guesswork at best. Sometimes the true intention of one or even of both parties may be defeated, as when the rule is applied of giving a contract the meaning its plain, clear language implies, irrespective of what the parties may claim it was intended to mean. So, while use of rules of interpretation and construction may not always result in ascertaining the true intention of parties in using particular language in a contract, their use yet must be better than pure guesswork in most cases else they would never have been evolved. Accepting that as a sound premise, I examine the lease contract in this case.

#### THE PRINTED FORM

The original parties to the lease involved in this case used a printed form as a basis for putting their agreement in writing. The form was prepared for use by parties entering into an oil and gas lease; it grants no interest in other minerals to the lessee. The form was obviously prepared when gas had little or no commercial value. For, while providing for a royalty of one-eighth of production on oil, and royalties on gas "used off the premises" of $100.00 per well per annum on gas produced from gas wells and $50.00 per well per annum on gas produced from oil wells, it contains no express provision for payment of royalty on gas *sold*.

I suggest that the gas royalty clauses in the printed form are obviously of doubtful

meaning. It does not solve the doubt entirely to say that the word "used" as there employed does not mean "sold," and hence that the parties did not intend that the flat-rate royalty there provided cover and include payment to the lessor for gas sold commercially by the lessee. There is still doubt as to the meaning of the phrase "used off the premises." Does it mean used off of the premises *by the lessee?* Or does it mean used off of the premises *by the lessee or by anyone to whom title is transferred by sale or otherwise?* Quite clearly it could mean either. The breadth of the language, without express limitation to use off of the premises *by the lessee,* would seem to indicate that the parties intended the phrase to mean the latter. On the other hand, the prevailing practice at the time, of use by lessees of gas produced on one lease for drilling and development purposes on other leases, would seem to indicate that the parties intended the phrase to mean the former.

It does not answer the question to say that since the operative effect of the lease form is to grant absolute title to the gas, the lessee can use, sell, flare or dispose of it as he may please. Of course he can. The question still remains, under what state of facts is he obligated to pay the flat-rate royalty? If he intends to flare all of the gas not used on the premises and does so, he certainly is not obligated to pay the royalty. If he intends to use *any* or *all* of the gas off of the premises himself, he is obligated to pay the royalty. But what if he intends to use none of the gas off of the premises himself but intends to, and does, sell it to others who use it off of the premises? Is he then obligated to pay the flat-rate royalty? Or is the lessor entitled to no royalty? I know of no decided case which has answered these questions, and I do not undertake to answer them here. I pose them only for the purpose of demonstrating that had the parties merely filled in the blank spaces in the printed form, without further change or interlineation, the

contractual rights and obligations of the parties with respect to the payment of royalty on gas sold by the lessee and used by others off of the premises would have been so doubtful as to require resolution by application of rules of construction.

## CHANGES IN THE PRINTED FORM

The printed form was not merely filled in without further change. In reducing their agreement to writing the parties interlined the words "potash or other minerals" after the words "oil and gas" in the granting clause and the same words after the words "oil or gas" in the term clause, and added the words "and ⅛ of the net proceeds of potash and other minerals at the mine" at the end of the first royalty clause.

Now, we do not and cannot have evidence of what was said by the parties in the negotiations that led to these changes. We cannot know, therefore, what rights and obligations, differing from those provided in the printed form, the parties *really* intended to create by their additions and interlineations. On the record before us we can be certain that before concluding their negotiations the parties intended to convert the printed form oil and gas lease into a lease covering minerals other than oil, gas and potash, because that is what they did when they inserted the words "or other minerals" in the granting clause. We can also be certain from the insertion of the word "potash" in the granting, term and first royalty clauses that either the lessee wished to make certain of his right to prospect for, and mine and sell potash, or the lessor wished to make certain of his right to a one-eighth royalty if potash were discovered, mined and sold. Which of the negotiating parties initiated the discussion leading to the specific inclusion of potash in these clauses we do not know. Neither do we know whether the agreement to include potash, specifically, preceded or followed agreement to include "other minerals." What we do know is that before the parties put their agreement in final written

form they had negotiated a lease which authorized the lessee to prospect for and mine not just oil and gas, but oil, gas, potash and other minerals, and which required the payment of royalties to the lessor on oil, gas, potash and other minerals. They were then faced with the task of changing the printed form to effectuate their agreement.

The logical place for the parties to have begun making changes in the printed form so that it would conform to their agreement was at the top or in the first part of the instrument; and it is thus reasonable to conclude that they agreed upon the interlineations in the granting and term clauses before they reached the royalty clauses and agreed upon the addition thereto.

Had they been lawyers, the parties likely would have known that the simplest ways to change the granting clause to convert the printed form into a general mineral lease, if that was their intention, would be to strike the words "oil and gas" and substitute the words "all minerals," or "the minerals," or to leave the words "oil and gas" and insert "and other minerals." Either change would have effected a grant of oil, gas, potash and all other minerals; but then the purpose of specifically naming potash would not have been accomplished. Besides, there was really no sound reason for striking the words "oil and gas" or of omitting potash from the interlineation if the parties intended that the clause grant all minerals. Thus the *manner* of amending the granting clause chosen by the parties can have little or no significance in determining what the parties intended by their amendment of the royalty provisions. What has been said with respect to amendment of the granting clause applies also to the amendment of the term clause.

Having agreed on the changes to the granting and term clauses in the printed form, it is reasonable to conclude that, in logical sequence, the parties next considered the adequacy of the printed royalty clauses to effectuate their agreement. It would be totally unreasonable to conclude that they considered and dealt with the three royalty clauses separately and as though the others were not in the printed form.

The first royalty clause provided for a percentage royalty on oil only. The second and third clauses provided flat-rate royalties on gas only, and only on gas while being "used off the premises." There was no provision in any of the three clauses for payment of royalty of any kind on potash, and no provision for royalty of any kind on other minerals mined and "sold." The parties cured these deficiencies by adding at the end of the first royalty clause "and ⅛ of the net proceeds of potash and other minerals at the mine." When they provided for a royalty out of "the net proceeds" they obviously were providing for royalty on "potash and other minerals" which were sold.

## CONSTRUCTION OF THE LEASE

The foregoing analysis of the conduct and action of the parties on what seems to me to be the most reasonable and logical basis brings me to a consideration of the meaning of the lease as finally written and executed by the parties. Since we have no way of knowing what the parties *actually* intended, we must arrive at their intent, as best we can, by application of standard rules of interpretation and construction.

The ultimate question is, of course, whether the parties intended the words, "other minerals," used in the first royalty clause, to include gas. I reject the idea advanced by petitioners that we should answer the question by looking to the first royalty clause alone, and I accept the view that it should be answered by considering the entire instrument. Petitioners surely would not contend that we should answer the question by looking only to the first royalty clause if the second royalty clause expressly provided a flat-rate royalty of $100.00 per annum per well on gas produced and *sold* from gas wells, and the third

royalty clause expressly provided a flat-rate royalty of $50.00 per annum per well on all gas produced and *sold* from oil wells. For the reasons given in the opinion prepared by Justice HAMILTON, I also reject the "construction-by-the-parties" and "ejusdem generis" rules, advanced by respondents and adopted by the Court of Civil Appeals, as sound bases for arriving at an answer to the question. I agree that the question should be answered by application of the rule of construction which requires courts to harmonize and thus to give meaning to all apparently conflicting provisions of a contract when this may reasonably be done.

On the face of the lease as finally written and executed by the parties there is a possible conflict between the first royalty clause and the second and third royalty clauses.

I accept as settled law that the words, "other minerals," include gas. Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 127 A.L.R. 1217. And if the second and third royalty clauses were not in the executed lease, I have not the slightest doubt that we would be in unanimous agreement that respondents would be obligated to pay royalty to petitioners of ⅛th of the net proceeds of gas sold for use off of the premises.

On the other hand, if the words, "other minerals," had not been included in the addition to the first royalty clause and the second and third royalty clauses were in the lease, and if all gas produced were sold for use off of the premises, I have no doubt that we would hold that respondents were obligated to pay the flat-rate royalty rather than that respondents were relieved altogether of an obligation to pay gas royalties. That appears to be one of the holdings in Lone Star Gas Co. v. Harris, Tex.Civ.App., 45 S.W.2d 664, 667, writ refused, although, as may be observed from reading the opinion as there reported and the opinion in an earlier appeal in the same case in Tex.Civ. App., 19 S.W.2d 178, that issue was not really a contested one.

In some of the cases cited by respondents the courts have used language indicating that the obligation to pay flat-rate royalties on gas sold for use off of the premises, under royalty clauses substantially the same as the second and third clauses in the instant lease, was clear and unambiguous, but in none of the cases was the obligation a contested one; in each the lessor was seeking royalties *in addition* to the flat-rate royalties, and the lessee was seeking to limit its obligation to payment of the flat-rate royalties. In Mussellem v. Magnolia Petroleum, 107 Okl. 183, 231 P. 526, the Supreme Court of Oklahoma held that a similar clause was unambiguous in that as a matter of law it did *not* require the lessee to pay *more* than the flat-rate royalty for gas sold for use off of the premises. A similar holding was made by the Court of Appeals in Lackey v. Ohio Oil Co., 10th Cir., 138 F.2d 449. But in neither case was it held that the clause in clear and unambiguous language *required* the lessee to pay the flat-rate royalty on gas sold for use off of the premises, and in each of the cases the court seemed impelled to bolster its holding by resort to the rule of practical construction by the parties.

But whatever may have been the factual background of the cited cases, I cannot agree that the obligation of the lessee under the second and third royalty clauses to pay the flat-rate royalty is plain and clear when the lessee uses none of the gas off of the premises himself but sells it to others who do use it off of the premises. My conviction that we would require payment of the royalty if the question were presented is based upon my belief that the language leaves the obligation doubtful, that the doubt could not be resolved by rules of construction and is therefore ambiguous, and that we would follow the rule of resolving the doubt in favor of the promisee or lessor, as with other ambiguous contracts. Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 157; Williston on Contracts, Revised Edition, § 621.

But we do not have a lease which contains only the first royalty clause with the addition, or which contains only the printed-form second and third royalty clauses. As is pointed out by Justice HAMILTON, we have a lease which in its first royalty clause, as amended, imposes a clear legal obligation to pay royalty of ⅛th of the net proceeds on gas sold, including gas sold for use by others off of the premises, and which in its second and third royalty clauses does not impose clear legal obligations to pay flat-rate royalties on gas sold for use by others off of the premises but are ambiguous in that respect. I agree that to avoid repugnancy and harmonize the provisions of the lease the second and third royalty clauses should be held to apply only to gas used off of the premises by the lessee and the first royalty clause should be held to apply to gas sold to others for use off of the premises.

GRIFFIN, Justice (dissenting).

I cannot agree with the majority opinion and file this dissent.

There are certain fundamental principles of law which we must recognize.

First: The instrument in question, referred to as an oil, gas and mineral lease, conveyed to the lessee ⅞ths of the oil and all of the gas, potash and other minerals. These substances became the absolute property of the lessee with all the attributes of legal ownership. Stephens County v. Mid-Kansas Oil & Gas Co. (1923), 113 Tex. 160, 254 S.W. 290, 29 A.L.R. 566; Humphreys-Mexia Co. v. Gammon (1923), 113 Tex. 247, 254 S.W. 296, 29 A.L.R. 607; Ehlinger v. Clark (1928), 117 Tex. 547, 8 S.W.2d 666(2, 3); Magnolia Petroleum Co. v. Connellee (1928, Comm. of App.), 11 S.W.2d 158(3). The personal obligation of lessee was to do the things required of him by the lease contract, one of which was to pay the royalties and rentals provided by the lease.

Second: In construing the terms of a written instrument, the words used therein are to be given their usual and ordinary meaning, unless it is clearly shown the parties intended for a different meaning to be given. 13 Tex.Jur.2d 312, Contracts § 135, and authorities therein cited.

Third: Provisions in a contract, when in apparent conflict, *must* be reconciled and harmonized whenever possible by *any reasonable interpretation,* so that the contract as a whole may be given effect. 13 Tex. Jur.2d 323, Contracts § 142 and authorities therein cited.

Fourth: Courts must, if possible, give effect to all parts of a contract. Leon v. Gulf Production Co. (1931, Tex.Civ.App.), 35 S.W.2d 1101(3), writ refused; City of Stamford v. King (1940, Tex.Civ.App.), 144 S.W.2d 923, writ refused; Chapa v. Reid (1952, Tex.Civ.App.), 248 S.W.2d 299 (2); 109 A.L.R. 1464.

Fifth: Words used in one sense in a contract are as a general rule deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise. McDaniel et al. v. Newton et al. (1945, Tex.Civ.App.), 187 S.W.2d 139(2), writ refused w/m; Green Avenue Apartments v. Chambers (1951, Tex.Civ.App.), 239 S. W.2d 675(3), no writ history; Johnson v. Dick (1955, Tex.Civ.App.), 281 S.W.2d 171 (6), no writ history; 13 Tex.Jur.2d 314, § 135; 17A C.J.S. Contracts § 303 p. 150; Williston on Contracts, 3rd Ed. Vol. 4 (1961) § 618, pp. 715–16.

Sixth: Judicial interpretation of a contract does not reach a point where the meaning of some significant word can be said to be in doubt and it is permissible to assign thereto one of two meanings either of which is within the reasonable scope thereof, upon merely arriving at a conclusion that such word may, as an abstract proposition, be given either of two meanings. A word in a contract, taken by itself, often admits of two meanings when

from the whole contract to be interpreted there is no reasonable doubt as to the sense in which the parties used it. In that situation, the particular sense they ascribed to the word when the contract was made must be adopted if it is within the reasonable scope thereof. 12 Am.Jur. § 236, p. 761, and authorities therein cited.

Seventh: Courts will not torture words in order to import ambiguity. Words do not become ambiguous simply because lawyers or laymen contend for different meanings or even though their construction becomes the subject matter of law suits. 17A C.J.S. Contracts § 300 pp. 141–142 and authorities therein cited.

All emphasis contained in this opinion is that of the writer, unless shown differently.

With the above rules in mind, let us examine the lease contract to be construed in this cause. The majority opinion says that as a matter of law the words "other minerals" as used in the first royalty clause includes "gas." With this construction, I do not agree.

The parties first use the term "other minerals" in the granting clause and it does not include "gas" as there used. The lessors granted, demised and let, etc. unto the lessee for the sole and only purpose of mining and operating for (1) oil, (2) gas, (3) potash and (4) "or other minerals." It is true that the word "minerals" as a generic term includes "gas" as well as "potash" and "oil," but that word is not here used in its sense as a generic term. Its use is to define a class of minerals contrasted with and different from "oil," "gas" and "potash." If this were not true the use of "other minerals" is meaningless and a mere repetition, and the use of the words "oil," "gas" and "potash" was wholly unnecessary, because each and every one is a mineral, and included in the term "other minerals."

It will be noted that in all of those cases cited by the majority to sustain their hold-

ing that "other minerals" as a matter of law includes "gas", the words "gas" or "oil" do not appear anywhere in said instruments. These cases merely hold that "other minerals" was used in the generic sense and includes "oil and gas." These cases are not in point as authority in our case.

The majority opinion says the rule of ejusdem generis has no application in this cause so as to confine the meaning of "other minerals" to mineral substances like unto "potash." With this I agree. The word "other" preceding the word "minerals" clearly shows the parties meant something different from, and contrasted with the minerals theretofore mentioned, to-wit, "oil," "gas" and "potash."

The parties were setting up a fourth classification which they were granting, to-wit, other minerals not "oil," "gas" or "potash."

Webster's Third New International Dictionary defines "other" as being one distinct from the one or those first mentioned * *, not the same. Different, distinct. "A different one, an additional one, something that exists as an opposite of, or excluded by, something else." This is also the common, ordinary and usually accepted meaning of "other," and we, as a Court, should give "other" such meaning wherever it is found in this lease.

Let us examine the rest of the lease to see if there are any words used to change the above meaning of the term "other minerals." The next time we find these words used is in the typewriting which precedes the description of the property conveyed. Here it is stated, " * * * this lease shall become a mineral deed to seven-eighths of *all minerals* on, in, under the *above* described lands * * * this includes potash and *all* other minerals." The parties added the last quoted phrase to be sure that the two additional classifications they had made in the granting clause, to-wit, "potash or other minerals" would be covered by the provision that the lease should be "a mineral deed"

under certain circumstances. That minerals was not used in its generic sense, but in a particular and specific sense as excluding "oil," "gas" and "potash" is shown by the phrase "all *other* minerals." Had "minerals" in the generic sense been the meaning, there would have been no necessity for adding the last phrase, for in this same typewriting and in the section preceding the words "all other minerals" the parties had prescribed that the lease should become "a mineral deed to seven-eighths of *all minerals* * * *." By the use of the words "and all other minerals" in this typewritten language, the parties again demonstrated they meant a classification distinct from, and different from the terms "potash" and "all minerals" as above used. Therefore, in this use of "other minerals" there is nothing to justify giving a different meaning to these words than that given by the parties in the granting clause.

The next time we find the words "other minerals" used in the lease is in the term paragraph. This provides for a 20-year life for the lease, "and as long as oil, gas, potash, or other minerals," or either of them is produced from said land by the lessee. Here the parties confirm their use of "other minerals" as a distinct, separate and contrasting classification from "oil," "gas" and "potash," which they have specifically enumerated.

My reasoning heretofore set out as to the meaning of the term "other minerals" applies with equal force to this particular use, and I will not repeat it. The parties show they intend "other minerals" as used the three times we have discussed, to have the same identical meaning in each instance, i. e., a separate and distinct classification from "oil," "gas" and "potash."

We now come to the royalty provisions, whereby the parties set out how the lessees should make payment for each of the four distinct classifications of substances, absolute title to which was conveyed to the lessees by the granting clause. So far I have demonstrated that nothing contained in the

lease will justify a meaning for the words "other minerals" differing in any particular from that given by the parties when it is first used in the granting clause.

The parties provided that for (1) *oil* produced by the lessee, it should "deliver to the credit of lessor, free of cost, in the pipeline to which they may connect their wells, the equal one-eighth part of all oil produced and saved from the leased premises; (2) for potash the lessees should pay to lessor one-eighth of the net proceeds at the mine; and (3) for other minerals the same payment as for potash, to-wit one eighth of the net proceeds at the mine; and (4) for gas from each well where gas only is found, while same is being used off the premises, to pay to lessor $100 each year in advance; and (5) to pay lessor for gas produced from any oil well and used off the premises at the rate of $50 per year for the time during which such gas shall be used, payments to be made each three months in advance."

Thus, we see that the parties agreed on the compensation to be paid for each of the four classifications of the minerals that they had made in the granting clause and confirmed in the typewritten description and in the term clause.

I cannot see nor find anything in the lease that shows the parties intended "other minerals" as used in the first royalty clause to have a meaning different than they had given it when they had used the same expression in the three preceding parts of the lease. Therefore, it must follow that such term "other minerals" must be construed by the Court as not including "gas," but referring only to minerals distinct and different from "oil," "gas" or "potash."

The majority opinion makes an ambiguity in the first royalty provision by "having concluded that the words 'other minerals' when used in the first royalty clause includes *gas*, etc." I have demonstrated above that this just cannot be the correct construction of this lease.

The majority relies on some language in the case of Reynolds v. McMan Oil & Gas Co. (1928, Tex.Comm. of App.), 11 S.W. 2d 778, found on pp. 782–783, opinion approved by the Supreme Court. This language is with regard to the meaning of the words "used off the premises" as contained in the second and third royalty provisions.

In the first place, the language referred to is dictum and is so recognized by the writer of the opinion. The recovery in the Reynolds case was granted to plaintiffs for the reason that the Court determined that the gasoline manufactured from casinghead or wet gas was *oil*, rather than *gas* and was covered by the oil royalty provision. The Court said: "The undisputable fact remains that the contract as a whole, in plain, certain, and unambiguous terms, excepted and reserved to the lessor in any and all events one-eighth of all oil produced and saved from the premises, free of cost, and that large quantities of gas containing oil have been produced and saved from the premises. So the conclusion is inescapable that plaintiffs in error are entitled to recover."

Again, the majority opinion herein attempts to create an ambiguity in the meaning of "other minerals" as used in the first royalty clause by first assuming that it includes gas—which it does not—and therefore using the term "⅛th of the net proceeds at the mine" *might* mean this royalty provision covers sale of gas, whereas, the terms of the second and third royalty clauses where it is provided for payment for gas "used off the premises" *might* not cover a sale, and therefore a conflict between the royalty clauses as to gas might result.

This is erroneous reasoning for it violates the third rule of law laid down at the beginning of this opinion, to-wit: "Provisions in a contract, when in apparent conflict, *must* be reconciled and harmonized *whenever possible* by any reasonable interpretation, so that the contract as a whole may be given effect."

I have demonstrated that the parties to this lease did not use the term "other minerals" in its generic sense, and therefore it does not include "gas." Such reasoning is a reasonable—and in fact the only interpretation—of the term when used in the three instances preceding its use in the first royalty provision. There is not a word in the lease showing or even intimating that this term was intended by the parties to include "gas." That it does include "gas" in this lease is pure speculation and without factual basis. In fact, the majority use the words "used off the premises" and "⅛th of the net proceeds" to create the ambiguity and not the term "other minerals."

By giving the meaning to the term "other minerals" which I believe the parties gave to it, we avoid any conflict of provisions in the lease, and have definite payments for each of the four component parts. Paragraphs 2 and 3 of the royalty provisions provide for all gas that can be produced from these premises, i. e., gas produced from an oil well, and gas from a well producing gas only. There is no other way to produce gas from land known to the industry at the present time, nor at the time the lease was executed. Therefore, my construction should be given to the term "other minerals" in every place we find it in the lease.

This suit is one for the proceeds of gas sold by lessees to processors off the premises, and is not a suit for gas produced from an oil well as was the situation in the Reynolds case. Petitioners in their application admit that this is true, and explain their failure to sue for gas produced from an oil well by stating, "The record in this case shows that no proceeds of the sale of gas that were made from shallow wells (none of which were known to petitioners) [and which wells were oil wells also producing gas] were so insignificant in amount that as a practical matter the additional royalties, if any, recoverable over and above the amount of the flat rate royalties already paid on the shallow [oil and gas producers]

wells, were not worth the trouble and expense involved in including them in this suit."

We have, therefore, a suit for the proceeds of gas produced from gas wells only. For such gas the parties made specific provision in the second royalty agreement whereby lessees were to receive $100 per year per well for such gas. The undisputed evidence shows this has been paid and accepted by the lessors for approximately 30 years prior to filing of this suit.

When the majority opinion says, "In fact, we have concluded that the term 'used off the premises' is ambiguous," it is contrary to at least two opinions of this Court, and of opinions of the Commission of Appeals.

The first case is that of Magnolia Petroleum Co. v. Connellee et al. (1928, Tex. Comm. of App.), 11 S.W.2d 158, decided one week before the Reynolds case. While it is true the royalty provisions in the lease there involved contained provision for gas from a well producing gas only, "sold or used off the premises," and for "casinghead gas when sold or used off the premises," the reasoning of Judge Leddy, speaking for the Court is applicable to our case.

The Court says it is immaterial to a decision of that case whether casinghead gas is "oil" or "gas" and said, "This court is asked to hold that because casinghead gas is shown to be the result of a separation of the lighter or volatile part of the oil that it should be paid for as oil *when the parties have expressly contracted and agreed that it should be paid for in a particular way as casinghead gas.* To so hold would require that this court write into the contract language which the parties themselves did not place there."

The Court then discusses the fact that casinghead gas is the same as wet gas or gas coming from an oil well, and that this fact was well known by the parties and the industry at the time the lease was executed [October 29, 1917], and said: "The parties

to this contract by language certain, specific, and definite, separated the various substances expected to be produced from wells drilled on the premises, and specifically fixed the compensation to be paid for each, and for this court *to separate these substances in any different way or provide another and different compensation would be to substitute an entirely new contract for the one made by the parties.*" l. c. top 1st col. p. 161 of 11 S.W.2d.

How applicable that language is to our case.

The Connellee case is in point in our case for another reason, which is, that in the royalty paragraph (which was one paragraph instead of being different numbered royalty provisions, but this fact does not distinguish such provision from the provision added to the first royalty paragraph in our lease) after enumerating royalty to be paid on (1) oil; (2) gas from a well producing gas only; (3) casinghead gas; there was a fourth provision (as in our royalty clauses) "for all other minerals 1/8th of the net proceeds thereof." While not in the exact wording, this means the same as our wording added to the first royalty paragraph.

Plaintiffs in the Connellee case—as in the case at bar—sought recovery under this royalty provision, contending it was a "mineral."

The Court overruled this contention in the following language:

"The insistence is also made that defendants in error should be permitted to recover one-eighth of the value of the gasoline produced from casinghead gas under the theory that it is neither gas nor oil, but that it is a 'mineral' within the contemplation of the provision requiring lessee to pay 'for all other minerals one-eighth of the net proceeds thereof.'

"Lessors would no more have the right to separate a mineral susbtance

from casinghead gas and receive additional compensation than it would have to separate any minerals from the seven-eighths of the oil belonging to lessee and claim compensation for it as other minerals. Whatever minerals were contained in casinghead gas as the same was known, defined and popularly understood at the time of the execution of the lease, were included in the sale thereof at the compensation expressly stipulated therefor. *The term 'other minerals' refers to separate and distinct minerals not covered by the terms oil, gas, and casinghead gas."*

That holding alone is directly contrary to the holding of the majority opinion and should control all of its reasoning about "other minerals" including "gas" in the lease we have here.

While the Supreme Court did not expressly approve the Connellee case, in the case of Magnolia Petroleum Co. v. Akin et al. (1928, Tex.Comm. of App.), 11 S.W.2d 1113, which was decided on the authority of the Connellee case alone, the Supreme Court said: "We approve the holding of the Commission of Appeals on the questions discussed in its opinion." This has to be an approval of the Connellee case.

One of the early cases in which plaintiffs sought to recover ⅛th of the proceeds of product or products manufactured from gas produced from the leased premises was the case of Harris v. Lone Star Gas Co. (1929, Tex.Civ.App.), 19 S.W.2d 178, writ refused. The trial court sustained a demurrer to plaintiff's pleadings and rendered judgment for the defendant gas company. On appeal the Court of Civil Appeals held the case until the Reynolds case was decided, because the lease contract was the same as in the Reynolds case and the pleadings were also the same. After the Reynolds case was handed down by the Commission, the Court of Civil Appeals acted on the Harris case. The royalty provisions, so far as the printed provisions are concerned, were identical with those in our case at bar. They provided for the same oil royalty; had the same provision—except as to amount—for payment for gas from a gas well, "While same is being used off the premises," and for gas produced from any oil well "and used off the premises."

In reversing the trial court's action sustaining the general demurrer and ordering that the cause be tried under the theory that the gas from which the products were produced was "oil" and covered by the oil royalty provision, rather than the gas royalty provisions, the court discusses the contention of the plaintiff whereby he sought to recover the value of all the natural gas appropriated by the lessor. Plaintiff contended that by the terms of his lease he did not sell any part of his gas, but only permitted the use thereof, both on the premises and off the premises; and plaintiff further pleaded that the word "used" as employed in the lease, did not constitute a sale of his gas, wherefore, he sued for same, or the value thereof. Thus, we have the court confronted with the meaning of the word "used" in the second and third gas royalty (or rental) clauses of a lease identical with our own. The majority opinion herein says that "used off the premises" might or might not mean "sold"; therefore, we have an ambiguity. This contention was passed upon by the Court of Civil Appeals in the Harris case, and contrary to the contention of plaintiff therein and to the majority opinion herein. The court said:

"Under the above authorities, and especially the opinion in the Reynolds Case, it occurs to us that there is but one conclusion to be reached from the decisions, and that is that under the terms of the appellant's lease in the instant case, and for the considerations noted, the granting clause of the lease placed title to the 'natural gas' in the lessee, and clothed it and its assigns with full and complete authority to sell or dispose of the same without in-

curring obligations other than may be found in the personal obligation of the lessee to pay the lessor $300 and $50 per year, respectively, under the provisions of sections 2 and 3, setting forth the considerations for the lease."

This Court within about seven months after the Reynolds case had been handed down, and while the same three Judges were members of this Court, gave the application for writ or error in the Harris case an unqualified "Refused." That meant that the principles of law declared in the Court of Civil Appeals' opinion were correctly decided. Heinatz v. Allen (1949), 147 Tex. 512, 217 S.W.2d 994, and this Court adopted the Court of Civil Appeals' opinion as its own. Myers v. Gulf Coast Minerals Management Corp. (1962, Tex. Sup.Ct.), 361 S.W.2d 193.

In the case at bar, plaintiffs seek no recovery for gas produced from an *oil well* or on the theory that such substance for which they sue *is "oil"* within the terms of the oil royalty provision. Plaintiffs sue only for the value of *gas* produced from the wells on the lease producing *gas only*, and have so limited their suit.

The Harris case again reached the Court of Civil Appeals after a trial. Lone Star Gas Co. v. Harris (1932, Tex.Civ.App.), 45 S.W.2d 664, writ refused. Plaintiffs amended their petition, so as to sue for the annual rental of $300 per year as provided in the lease, and also sought to recover one-eighth of the gasoline (or oil) and therefore included in the "oil" royalty provision. The trial court awarded judgment for plaintiffs on both theories. The Court of Civil Appeals reversed the recovery of value of gasoline (or oil) but affirmed recovery of $300 per year for gas from each well where gas only is found, *while the same is being used off the premises.*

In the course of its opinion the court said, speaking of its first opinion (19 S.W.2d 178), " * * * and whether it was necessary to a decision of the case or not, we did recognize that, under conditions, the right of recovery for gas from a gas well must be limited entirely to the provision of the lease providing the $300 annual gas royalty. In that opinion we stated that, under the Reynolds Case," (and here the court sets out the quote from the Reynolds case that I have set out next above).

The Court of Civil Appeals then discusses the Commission of Appeals' case of Lone Star Gas Co. v. Stine (Tex.Com.App. 1931), 41 S.W.2d 48, 49, 82 A.L.R. 1299, wherein a recovery was sought for gasoline extracted from gas from a gas well, and concluded that the lessee "acquired the right to all gas from each well where gas only is found by paying $300 each year for the same."

The court then discusses the case of Humble Oil & Refining Co. v. Poe (1930, Tex.Comm. of App.), 29 S.W.2d 1019, and quotes the following therefrom:

"It is difficult to conceive upon what theory defendant in error was entitled to recover for gasoline which could have been manufactured from gas produced from a gas well, in the face of the provision in the lease that 'lessee agrees to pay the lessor at the rate of $250 each year, payable quarterly in advance, for the gas from each well where gas only is found, while the same is being used off the premises.' * * *

"Plaintiff in error acquired the right to use the gas produced from a gas well it might drill on the premises covered by the lease by the payment of the agreed rental of $250 per annum. Having bought and paid for such gas it owned the same, including all of its constituent elements, and therefore, had the lawful right to make such use of it as it might deem proper. Wilson v. King Smith Rfg. Co., 119 Okl. 256, 250 P. 90; Shaw v. Fender, 138 Ga. 48,

74 S.E. 792; McRae v. Smith, 164 Ga. 23, 137 S.E. 390; Magnolia Petroleum Co. v. Connellee, supra." (11 S.W.2d 158).

The reasoning for refusing recovery for any amount other than the $300 per year per well, is set out as follows:

"The legal effect of the deed was to convey 'all natural gas,' and by the term 'natural gas' is meant all the constituent elements composing the same. The gas company, having become the owner of 'all natural gas' in or under this land, has the right to make such use thereof as it sees fit. It may sell the gas in its natural form as it came from the earth, or it may split it into its constituent elements and sell such elements, including the gasoline." Quoting from the Stine case, supra. (Harris opinion bot. 1st col. 667 of 45 S.W.2d).

In discussing the right to recover for the gasoline content of the gas—and which reasoning applies in our case to recovery as "other minerals,"—the court said: "Such recovery would be in the nature of a double recovery for an element of gas theretofore sold in its entirety, together with the right of disposal."

This Court gave this last Harris case an unqualified "Refused" thus approving the Court of Civil Appeals' analysis of the Reynolds case, the Stine case and the Poe case.

No trouble was had by the Court in twice unqualifiedly refusing application for writ of error wherein the Court held that "used off the premises" meant right to sell or dispose of the gas. How then can the majority raise any question as to the meaning of "used off the premises" so as to create an ambiguity? By accepting what this Court has approved in two cases, and the Commission of Appeals in at least two cases, the majority should construe the lease here in question so as to avoid any conflict between the first royalty provision and the second and third royalty provisions. Such is the duty of a court construing contracts. Also, there would be no basis for the majority holding that an ambiguity is created because the majority cannot say "used off the premises" does not necessarily mean "sold." If the previous holdings in the cases I have cited above are to be overruled, the majority should face up to that and say so, rather than have in the reports conflicting holdings by the Court.

The Supreme Court of Oklahoma, in construing an oil and gas lease with royalty provisions requiring payment for (1) gas from an oil well, (2) from a gas well "while the same is being used off the premises" and which lease also gave lessee the right to use "free of cost gas * * * for its operations thereon," said,

"The words 'off the premises' had no other meaning to the parties, than if the gas was appropriated to a purpose foreign to utilization for the benefit of development of the property itself. In other words, it did not have particular reference to place where used, but the purpose and objects of its use, to wit, one foreign to the development of the premises in question." Mussellem v. Magnolia Petr. Co. (1924) 107 Okl. 183, 231 P. 526, l. c. 2nd col. p. 531.

The above case was cited with approval in the case of Humble Oil & Refining Co. v. Poe (1930, Tex.Comm. of App.), 29 S.W.2d 1019.

Also the case of Lackey v. Ohio Oil Co. (1943, 10th Cir.), 138 F.2d 449 followed and approved the Mussellem case.

I would affirm the judgment of the Court of Civil Appeals.

WALKER and NORVELL, JJ., join in this opinion.

ON MOTION FOR REHEARING

Rehearing denied.

WALKER, Justice (dissenting).

The outcome of this case is a tribute to effective appellate advocacy. Petitioners have insisted from the beginning that the intention of the parties to the lease must be ascertained by first determining the meaning of the first royalty clause when considered alone, and then construing all of the other provisions in such manner that they will be in harmony with the previously determined meaning of such clause. To assist in presenting their oral argument, counsel for petitioners had prepared large poster boards with the relevant lease provisions printed thereon. Throughout most of their argument, however, they allowed us to see only the first royalty clause and kept the other portions of the display covered. It was only at the very end that we were allowed a glimpse of the remaining lease provisions. This approach is now embraced by the Court, although it does violence to the most fundamental of all rules for ascertaining the intention of parties to a written instrument. "It is axiomatic that, 'An agreement should be interpreted as a whole and the meaning gathered from the entire context and not from particular words, phrases, or clauses. In fact the entire agreement is to be considered to determine the meaning of each part. All provisions should, if possible, be so interpreted as to harmonize with each other.' 12 Am.Jur. 112, Contracts, § 241." Alderman v. Alderman, Tex.Civ.App., 296 S.W. 2d 312 (writ ref.). See also Moody v. Moody, 154 Tex. 114, 274 S.W.2d 535.

One is tempted to join in the majority opinion solely because of what, for want of a better term, we sometimes call the equities of the case. The idea that respondents could produce gas worth millions of dollars and pay as royalty only $100.00 per well per year is as shocking to my sense of fairness as it is to the other members of the Court. A judge would perhaps be less than human if he never experienced the desire to patch up, within what he conceives to be the limits imposed by law, deficiencies in an agreement which later turns out to be a bad bargain for one of the parties. On the other hand, petitioners are oil companies and have been engaged in the oil and gas business for many years. Presumably they had competent legal advice and knew the risks they were taking in acquiring the interests they now hold under the original lessors. In any event their position under the holding of the Court of Civil Appeals is no worse, and indeed is considerably better, than that of any landowner who sold and conveyed his minerals for a song forty years ago. Instead of setting out to reach a particular result in the present case, therefore, I have attempted to ascertain, in accordance with settled rules of construction, the intention of the parties to the lease at the time it was executed.

I begin with the lease as it was signed by the parties. A reading of the entire instrument discloses that there are two separate royalty provisions, each of which, when considered alone, clearly covers the gas production involved in this case. The first royalty clause reserves to the lessors "the equal one-eighth part of all oil produced and saved from the leased premises and 1/8 of the net proceeds of potash and other minerals at the mine." Gas is undoubtedly a mineral and certainly is covered by the term "other minerals" in the first royalty clause when the same is suspended in a vacuum and viewed apart from the remainder of the lease.

There are, however, other provisions which deal specifically with the royalty payable on gas produced from the leased premises. The second royalty clause obligates the lessee to "pay the lessor One Hundred Dollars, each year in advance, for the gas from each well where gas only is found, while the same is being used off the premises." This clearly, plainly, unequivocally, and even more definitely and certainly than the first royalty clause, applies to the gas production now in issue. It spells out in simple words the rights of the lessors and

the obligations of the lessee under the facts of this case. In view of the positions taken in the majority and concurring opinions, it perhaps should be pointed out that the second royalty clause does *not* purport to deal only with gas used by the lessee off of the leased premises. According to its own terms, the royalty therein provided must be paid whenever gas produced from a gas well is used off the premises. The gas here in question was produced from wells where gas only was found. It was used off the leased premises. Each condition, requirement and word of the second royalty clause is thus satisfied. How can it be said then that such clause is ambiguous within itself, or that there is any doubt or uncertainty as to the meaning and effect of its provisions standing alone? In my opinion there is no basis whatsoever for questioning its import unless one wishes to erect a straw man for the purpose of striking it down.

We thus have two separate and inconsistent royalty clauses either of which, according to their respective terms, might have been intended by the original lessors and lessee to govern the rights of the parties to this case. In these circumstances, my natural inclination is to say that the specific controls over the general. Since the parties dealt in plain and unmistakable language with the royalty to be paid on gas, it seems reasonable to suppose that the term "other minerals" was not used by them in the broad sense now attributed to it by the Court. When the remaining provisions of the lease and the circumstances surrounding its execution are considered, my natural inclination becomes a conviction.

The parties began with a printed form which covered oil and gas but no other mineral. This form contained provisions authorizing the lessee to operate for and produce oil and gas, stipulating that the lease would remain in force for a primary term of years and as long thereafter as oil or gas is produced from the land by the lessee, and spelling out in plain and specific terms the royalties which the lessors would be entitled to receive on oil and gas produced from the leased premises. Throughout the instrument only the word "well" was used in referring to the shaft or hole which would be sunk by the lessee in his search for and production of oil and gas. That word appears in the lease at least eleven times in either its singular or plural form.

By means of handwritten interlineations, the parties amended this printed form to make the same cover not only oil and gas but also potash and other minerals. They changed the granting clause to authorize the lessee to operate "for oil and gas, potash and other minerals." Obviously they did not mean for the term "other minerals" as used in that clause to include gas. They amended the habendum clause to provide that the lease would remain in force as long after the primary term "as oil or gas, potash or other minerals or either of them is produced from said land by the lessee." In making this interlineation, the parties clearly did not think that the words "other minerals" included gas. Finally, they changed the first royalty clause to require the lessee to pay as royalty "the equal one-eighth part of all oil produced and saved from the leased premises and ⅛ of the net proceeds of potash and other minerals at the mine." What did they mean by the words "other minerals" when this interlineation was made? They had already used the term twice, and in neither instance could they have intended for the same to include gas. They also knew that the lease already contained printed provisions specifically dealing with the royalties to be paid by the lessee on gas. They further knew that throughout the lease any shaft or pit through which oil or gas might be produced was referred to as a well. With this knowledge they amended the first royalty clause to make the same cover, in addition to oil, potash and other minerals *at the mine*. In these circumstances, it seems clear to me that they intended for such clause to apply only to: (1) oil; (2) potash, and (3) other

minerals that might be extracted from a mine as distinguished from an oil or gas well and which were not covered by the remaining royalty provisions of the lease.

It is no answer to say that the word "minerals" has been construed to include gas as a matter of law, or that an oil or gas well can be called a mine. Nor is it within our province to rewrite the lease so it will read as we might believe the parties would have made it read if they had envisioned subsequent developments in the oil and gas industry. Our problem and our responsibility are to ascertain the sense in which the words of the instrument were used by the lessors and lessee, and then enforce their agreement accordingly. The words of a legal document should never be given a fixed and unalterable matter-of-law meaning where it affirmatively appears from the instrument itself and the circumstances surrounding its execution that they were used by the parties in an entirely different sense. "An imaginary communism might conceivably bring men to such a level of intellectual uniformity that their thoughts would be expressed in invariably identical symbols. But until such a day comes, the varieties of individual expression and sense must be unquenchable. So long as men are allowed to grant and contract freely, and so long as the law undertakes to carry out those acts by enforcement, just so long must the standard of interpretation continue to be mobile, subjective, and individual." Wigmore on Evidence, 3rd ed. 1940, § 2462. From a reading of the entire lease in this case and after considering the circumstances surrounding its execution, I am persuaded that if the lessors and lessee had been asked, either immediately before or immediately after or at the time it was signed, whether they meant for the first royalty clause to cover and include gas, they would have replied with an emphatic negative. I would affirm the judgment of the Court of Civil Appeals.

NORVELL, J., joins in this dissent.