

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00085-CV

———————————————

GREGORY S. THOMAS AND T-4 FARM, LLC, Appellants

V.

BRIAN C. THOMAS, INDIVIDUALLY AND ON BEHALF OF
POST OAK OIL & GAS, LP AND POST OAK OIL & GAS GP, LLC,
Appellees

On Appeal from the 17th District Court
Tarrant County, Texas
Trial Court No. 17-360705-25

Before Sudderth, C.J.; Bassel and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

The question in this interlocutory appeal is one of contract interpretation: Did the parties agree to arbitrate the present dispute? Appellants Gregory S. Thomas and T-4 Farm, LLC answer "yes," pointing to arbitration language in two separate contracts and claiming that the trial court erred by denying their motion to compel arbitration and to stay the trial court proceedings. But because the answer is "no"— the parties did not agree to arbitrate the present dispute—we will affirm.

## I.  Background

The underlying lawsuit stems from Gregory's misappropriation of funds from Appellees Post Oak Oil & Gas, LP and Post Oak Oil & Gas GP, LLC (the Post Oak Entities), two oil-and-gas companies that Gregory owns with his brother, Appellee Brian Thomas.[1] The brothers share other businesses as well—including several oil-and-gas companies that they co-own with another family, the Kidds (the T&K Entities)—but those businesses are not parties to this litigation. Nonetheless, the T&K Entities' business plan (the Updated Business Plan) is one of the two contracts at the center of this appeal.

## A.  Updated Business Plan

In 2014, Gregory, Brian, and the other owners of the T&K Entities executed a three-page Updated Business Plan, which grouped the T&K Entities into two

---

[1]Post Oak Oil & Gas GP, LLC serves as Post Oak Oil & Gas, LP's general partner. Brian appears as a representative of both entities in this litigation.

divisions—Denver City and Breckenridge—and provided a high-level summary of each division's day-to-day management.[2] It also contained an arbitration provision for each division:

> The undersigned Parties agree to submit any and all disputes, claims or controversies regarding the operation of the [relevant] Division or any other matters involving, or related to, any Thomas & Kidd business or any of its owners to binding Arbitration . . . .[3]

The Updated Business Plan further provided that "all existing agreements to which the undersigned are a party are hereby amended as necessary to incorporate the terms of th[e] Updated Business Plan[]." Gregory and Brian signed the Updated Business Plan "[i]ndiviudally and in all other ownership, fiduciary or beneficial interest capacities with respect to the ownership or operation of the Denver City or Breckenridge Divisions."

## B. Protocol Agreement

Years later, Gregory was accused of stealing from various entities, including many of the T&K Entities and the Post Oak Entities. As a result, Gregory, Brian, and a representative from the Kidd family executed an agreement that established an

---

[2]The Updated Business Plan identifies Gregory as the manager of the Breckenridge Division.

[3]The Updated Business Plan contains a substantially similar one-page agreement for each of the two divisions, and each one-page agreement includes the quoted arbitration provision.

3

investigation and repayment procedure. That agreement—the Protocol Agreement—is the second contract at issue in this appeal.

The Protocol Agreement provided for an accounting firm's review of the compiled financial statements for the parties' businesses[4] and further provided that, should the parties dispute the accounting firm's findings regarding Gregory's unauthorized transactions, then they "agree[d] to participate in a mediation with JAMS before commencing arbitration." The parties also "agree[d] not to commence arbitration during the activities to be conducted under the Protocol [Agreement]" and "agree[d] that none of the actions described [in the Protocol Agreement would] constitute a waiver of any privilege or other protection, or of any objection to admissibility of evidence in any future arbitration." Despite these references to arbitration, the agreement fell short of requiring it. The Protocol Agreement did not contain a standard arbitration provision comparable to that in the Updated Business Plan, and in another section of the Protocol Agreement, the parties agreed "not to disclose any Confidential Information," contemplating court proceedings as a possibility and providing an exception to nondisclosure if a party was "compelled to do so by a Court of competent jurisdiction or an arbitrator appointed pursuant to [the] arbitration agreement in the Updated Business Plan."

---

[4]The Protocol Agreement addressed the compilation and review of the financial records of "Subject Entities," which was defined to encompass all "entities in which [the Kidd family representative] and/or [Brian] ha[d] a financial interest," with several T&K Entities and one of the Post Oak Entities called out specifically.

4

## C.    Litigation

In 2025, Brian and the Post Oak Entities (i.e., together, Appellees) filed this lawsuit, claiming that an accounting firm had uncovered more than $1.8 million in misappropriated funds, that Gregory had repaid just a small fraction of those funds, and that he had transferred some of the misappropriated funds to an entity he owned with his wife—T-4 Farm. While the background section of Appellees' petition delved into the history of the T&K Entities and Gregory's alleged theft from them, Appellees' causes of action were confined to Gregory's misdeeds against only the Post Oak Entities. Their petition did not seek to recover for Gregory's alleged misdeeds against the T&K Entities.

Gregory and T-4 Farm moved to compel arbitration and stay the trial court proceedings, pointing to the arbitration provision in the Updated Business Plan and the arbitration references in the Protocol Agreement. Appellees responded that the Updated Business Plan's arbitration provision did not include the Post Oak Entities but was limited to disputes involving the T&K Entities and that the Protocol Agreement, which did involve the Post Oak Entities, did not contain an arbitration provision at all. After conducting a hearing on Appellants' motion to compel, the trial court denied it without specifying a basis for its ruling.[5]

---

[5]At the hearing, the trial court commented that "the bottom line for the Court is . . . [i]f a party has not signed off on the arbitration agreement, then the Court does not believe that that party . . . should go to arbitration." However, the court signed an order denying the motion without specifying a basis for its ruling. And "[w]hen, as

5

This interlocutory appeal followed, *see* Tex. Civ. Prac. & Rem. Code Ann. § 171.098(a)(1), and we stayed the trial court proceedings pending appeal.

## II. Discussion

In their dispositive first issue,[6] Appellants argue that the trial court was required to compel arbitration based on (1) the Updated Business Plan's arbitration provision and (2) the Protocol Agreement's arbitration language.

### A. Standard of Review and Governing Law[7]

"A party seeking to compel arbitration must establish two things: (1) the existence of a valid arbitration agreement and (2) that the disputed claims fall within the scope of that agreement." *Wagner v. Apache Corp.*, 627 S.W.3d 277, 284 (Tex.

---

here, the trial court does not specify the basis for its order denying arbitration, we must uphold the trial court's ruling if it is supported by any legal ground asserted below." *Ferguson Braswell Fraser & Kubasta, P.C. v. SAF Oilfield I, LLC*, No. 02-22-00171-CV, 2023 WL 415616, at *3 (Tex. App.—Fort Worth Jan. 26, 2023, no pet.) (mem. op.).

[6]Appellants frame their appeal in two issues: (1) "[w]hether the trial court erred in denying Appellants' motion . . . when Appellees' allegations fall within the scope of the parties' [two] mandatory arbitration agreements" and (2) "[w]hether non-signatories to the [Protocol Agreement] can be compelled to arbitration as third-party beneficiaries or under the direct-benefits-estoppel doctrine." Appellants' first issue is dispositive, and we restructure it to align with the two alleged arbitration agreements: (1) the Updated Business Plan's and (2) the Protocol Agreement's. We need not reach Appellants' second issue. *See* Tex. R. App. P. 47.1.

[7]Neither the Updated Business Plan nor the Protocol Agreement identified a governing arbitration act. However, "arbitrability is subject to a virtually identical analysis under either the [Federal Arbitration Act] or the [Texas Arbitration Act]." *Rodriguez v. Tex. Leaguer Brewing Co. L.L.C.*, 586 S.W.3d 423, 427 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

2021); *see Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018); *Rachal v. Reitz*, 403 S.W.3d 840, 843 (Tex. 2013); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003). These are both legal questions subject to de novo review.[8] *Wagner*, 627 S.W.3d at 283; *J.M. Davidson*, 128 S.W.3d at 227; *Ferguson Braswell*, 2023 WL 415616, at *2.

Arbitration is "a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *Robinson v. Home Owners Mgmt. Enters., Inc.*, 590 S.W.3d 518, 525 (Tex. 2019); *see Wagner*, 627 S.W.3d at 283 (similar). Arbitration provisions are thus "interpreted under traditional contract principles," meaning that "[t]he plain language controls," the words are construed in context, and the language is given its ordinary grammatical meaning. *In re Whataburger Rests. LLC*, 645 S.W.3d 188, 194–95 (Tex. 2022) (orig. proceeding) (noting that courts "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless"); *J.M. Davidson*, 128 S.W.3d at 229 (similar); *Famous Water Co. v. Aquio Sols. Intermediate Holdings, LLC*, No. 02-23-00329-CV, 2024 WL 2971686, at *3 (Tex. App.—Fort Worth June 13, 2024, no pet.) (mem. op.)

---

[8]Generally, we review a trial court's ruling on a motion to compel arbitration for an abuse of discretion, deferring to its factual determinations as long as those determinations are supported by the record. *Ferguson Braswell*, 2023 WL 415616, at *2. But this appeal turns on the trial court's legal determinations regarding the existence and scope of the two alleged arbitration agreements, and "[i]f a party seeking to compel arbitration establishes the existence of a valid arbitration agreement that encompasses the parties and claims at issue, [then] the trial court has no discretion to deny the motion to compel." *Id.*

(similar); *BBVA Compass Inv. Sols., Inc. v. Brooks*, 456 S.W.3d 711, 719 (Tex. App.—Fort Worth 2015, no pet.) ("Courts examine the language in an arbitration agreement in context and give the language its plain grammatical meaning."); *see Wagner*, 627 S.W.3d at 285 (interpreting arbitration provision and reiterating that "our primary concern is to determine the intent of the parties as expressed by the plain language of the contract"). "No single provision taken alone will be given controlling effect." *J.M. Davidson*, 128 S.W.3d at 229; *Famous Water*, 2024 WL 2971686, at *3.

## B.    Updated Business Plan

According to Appellants, the T&K Entities' Updated Business Plan requires arbitration of the Post Oak Entities' claims. There is no dispute that the Updated Business Plan reflects an agreement[9] to arbitrate some matters—the question is whether the Post Oak Entities' claims fall within the arbitration agreement's scope. Appellants make two arguments in this regard: (1) that the Updated Business Plan's signatories—including Gregory and Brian—agreed to arbitrate "all disputes . . . related to . . . any of [the T&K Entities'] owners" and (2) that Appellees' claims touch on the T&K Entities themselves because Appellees' petition discusses Gregory's involvement in and misappropriation from the T&K Entities.[10]

---

[9]This is not to say that the Updated Business Plan reflects an agreement among or enforceable against all the parties to this litigation—an issue we need not address. *See* Tex. R. App. P. 47.1.

[10]Appellants raise a third argument as well:   They claim that, because the Updated Business Plan amends "all existing agreements to which the [signatories

8

### 1. The arbitration provision does not extend to the entire universe of "disputes . . . related to . . . [the] owners."

Appellants' first argument relies on an excerpt from the Updated Business Plan: the agreement to arbitrate "disputes . . . related to[] any [T&K Entities] or any of [the] owners." According to Appellants, this excerpt, coupled with the fact that Gregory and Brian signed the Updated Business Plan in their individual capacities, requires arbitration of "any dispute between any of them [i.e., the individual signatories], whether individually or on behalf of any company"—bar none. But such an interpretation ignores the quoted excerpt's context.

"[C]ontext matters when interpreting a contract." *Whataburger*, 645 S.W.3d at 196 (interpreting contract containing arbitration provision and noting that rejected interpretation was "plausible only if one read[] each snippet of text she point[ed] to in isolation"); *Famous Water*, 2024 WL 2971686, at *3 (interpreting arbitration agreement and reiterating that "context matters"); *see Estate of Neal*, No. 02-16-00381-CV, 2018 WL 283780, at *3 (Tex. App.—Fort Worth Jan. 4, 2018, no pet.) (mem. op. on reh'g) (interpreting will and reiterating that, "[w]hen construing documents, . . . we 'cannot divorce text from context'"). And context can be particularly important when, as

---

were] a party . . . as necessary to incorporate [the Updated Business Plan's] terms," the Post Oak Entities' company agreements were effectively amended to incorporate the arbitration provision. But this advances the ball only if the scope of the arbitration provision—the provision allegedly grafted into the Post Oak Entities' company agreements—encompasses the substance of Appellees' claims. Because we hold that it does not, we need not address Appellants' third argument. *See id.*

here, a quoted excerpt is narrowed by the unquoted text surrounding it. *See Neal*, 2018 WL 283780, at *3 (recognizing that "[t]he meaning of words read in isolation is frequently contrary to the meaning of words read contextually in light of what surrounds them" and that "everyday words and phrases" are "inordinately context-sensitive").

The parties to the Updated Business Plan did not agree to arbitrate the entire universe of "disputes . . . related to [the T&K Entities] or any of [the] owners." Rather, they agreed to arbitrate "disputes, claims or controversies regarding the operation of the [T&K Entities'] Division[s] or any other matters involving, or related to, any [T&K Entities] or any of its owners." The word "regarding" signals that what follows is a restriction on the aforementioned "disputes, claims or controversies." *See Regarding*, Webster's Third New International Dictionary (reprt. 2021) (1961) (defining "regarding" as "with respect to" or "concerning"); *Regarding*, Merriam-Webster, https://www.merriam-webster.com/dictionary/regarding (last visited June 16, 2025) (same). Put differently, the modifying phrase "regarding the operation of the [T&K Entities'] Division[s] or any other matters involving . . . any [T&K Entities] or . . . owners" is a limitation—it cabins the subject matter of the "disputes" the parties are agreeing to arbitrate. Yet, Appellants effectively ignore this limitation, treating the provision as a boundless commitment to arbitrate "any dispute between any of them," regardless of the subject matter.

10

From what we can gather, Appellants appear to have arrived at their boundless interpretation by reading the term "any other matters" as opening the floodgates of arbitrability. But the word "other" is relative by its very nature; it refers back to something else for its meaning. *See Other*, Webster's Third New International Dictionary (reprt. 2021) (1961) ("more" or "additional," as in "thou shalt have no [other] gods before me"; "often used after [a] noun and with *than*" as in "no clothes [other] than those he was wearing"); *Other*, Merriam-Webster, https://www.merriam-webster.com/dictionary/other (last visited June 16, 2025) (defining "other" as "additional" as in "sold in the U.S. and 14 other countries"; "being the one or ones distinct from that or those first mentioned" as in "taller than the other boys"); *cf. Southland Royalty Co. v. Pan Am. Petroleum Corp.*, 378 S.W.2d 50, 54 (Tex. 1964) (op. on reh'g) (interpreting phrase "other minerals" in contract and commenting that the phrase "used by itself could have no meaning" and "only takes on meaning when used in connection with a certain specific mineral or minerals"). Here, "other matters" points back to the preceding phrase "the operation of the [T&K Entities'] Division[s]," thereby communicating not only that such "operation[s]" are "matters . . . related to . . . [the T&K Entities] or . . . owners" but also that the alluded-to "matters" are similar in kind. *Cf. Sullivan v. Abraham*, 488 S.W.3d 294, 298 (Tex. 2016) (discussing statutory use of "other" and explaining that "[b]y referring to court costs, reasonable attorney's fees, and 'other expenses incurred,' the statute reflects both that costs and attorney's fees are 'expenses' and that they must all be

11

'incurred in defending the legal action'"); *Johnson v. Williams*, No. 02-19-00089-CV, 2019 WL 6334689, at *3 (Tex. App.—Fort Worth Nov. 27, 2019, pet. denied) (mem. op.) (interpreting statutory phrase "election officer or other person officially involved in the administration of the election" and explaining that, "[a]ccording to this context, an election officer is a person officially involved in the administration of the election" and that the "other person[s]" alluded to "should have a roughly similar role as an election officer"); *Neal*, 2018 WL 283780, at *4 (construing will that left "all other things . . . including [several listed items] or other intangibles" to decedent's niece and reasoning that decedent "expressly linked 'all other things' to [the listed items] . . . and to 'other intangibles,' a reference to the intangible personal property he had just described," thereby contextually limiting "all other things" to intangible personal property). In other words, when read in context, the Updated Business Plan reflects an agreement to arbitrate only those disputes "regarding, [i.e., concerning,] the operation of the [T&K Entities'] Division[s] or any other [similar] matters [which, like the divisions' operations, are] involving, or related to, any [T&K Entities] or any of its owners."

### 2. The substance of Appellees' claims does not touch on the T&K Entities' operations or similar matters.

This brings us to Appellants' second argument:  that, even if the Updated Business Plan does not extend to the entire universe of owner disputes, Appellees'

12

claims fall within the arbitration provision's scope because the claims touch upon the T&K Entities themselves.

"To determine whether a party's claims fall within an arbitration agreement's scope, we focus on the [petition's] factual allegations rather than the legal causes of action asserted." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 754 (Tex. 2001) (orig. proceeding); *see Rachal*, 403 S.W.3d at 850. When an arbitration provision uses broad language—as the Updated Business Plan does[11]—it requires arbitration if "the [plaintiff's] allegations touch matters [of], have a significant relationship with, or are inextricably enmeshed or factually intertwined with the contract." *Lon Smith & Assocs., Inc. v. Key*, No. 02-21-00227-CV, 2022 WL 1112388, at *5 (Tex. App.—Fort Worth Apr. 14, 2022, no pet.) (quoting *Athas Health, LLC v. Trevithick*, No. 05-16-00219-CV, 2017 WL 655926, at *4 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.)).

Appellants highlight several statements in Appellees' petition that they claim touch upon the T&K Entities:[12]

---

[11]*See Wagner*, 627 S.W.3d at 284 (describing arbitration clause as "broad, applying to 'any disputes'"); *Henry*, 551 S.W.3d at 115–16 (noting that "the scope of an arbitration clause that includes all 'disputes,' and not just claims, is very broad").

[12]Appellees' petition contains even more references to the T&K Entities than Appellants recite: the background section of the petition describes the history of the T&K Entities, the two divisions within the T&K Entities, Gregory's management of the Breckenridge Division, Brian's discovery of Gregory's misappropriation from the T&K Entities, and Gregory's neglected promise to repay the T&K Entities.

13

- The petition's assertion that "Brian learned that Greg[ory] had been supporting his lifestyle using and otherwise misusing funds from multiple Thomas family and Thomas–Kidd entities";

- The petition's statement that Gregory, Brian, and a Kidd family representative "agreed that [Gregory] would submit to an investigation of his financial activities with respect to a number of Thomas family and Thomas–Kidd entities"; and

- The petition's reference to Gregory's agreeing that the investigation's costs would be "paid by one of the Thomas–Kidd entities and treated as a loan to [Gregory]."

We agree that these factual allegations refer to "the operation of the [T&K Entities'] Division[s] or . . . other [similar] matters involving, or related to, any [T&K Entities] or any of its owners." But these allegations are also superfluous; they are merely mentioned in the background section of Appellees' petition and do not serve as the factual basis for any of Appellees' claims or grounds for recovery.

Again, "we focus on the [petition's] factual allegations" to determine a cause of action's arbitrability, *FirstMerit Bank*, 52 S.W.3d at 754, but not all factual allegations are created equal. The question is whether the parties agreed "for the substance of [the] dispute to be arbitrated"—not whether they agreed for anything mentioned anywhere in the plaintiff's petition to be arbitrated. *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 210 (Tex. 2007) (orig. proceeding) (explaining that an arbitration agreement cannot be avoided by artful pleading); *see BBVA Compass*, 456 S.W.3d at 718 ("Whether a claim is subject to arbitration turns on its substance; parties cannot evade an arbitration clause through artful pleading.").

14

Here, the substance of the dispute, i.e., the factual basis for Appellees' causes of action, is confined to the Post Oak Entities. Appellees' petition includes nine claims: (1) breach of Post Oak Oil & Gas, LP's company agreement; (2) breach of Post Oak Oil & Gas GP, LLC's company agreement; (3) breach of fiduciary duties that Gregory owes "[a]s a limited partner of Post Oak [Oil & Gas,] LP, and as a member–manager of Post Oak [Oil & Gas,] GP[, LLC]"; (4) conversion of partnership funds from the Post Oak Entities; (5) violations of the Texas Theft Liability Act by Gregory's misappropriating funds from the Post Oak Entities; (6) money had and received based on Gregory's misappropriation from the Post Oak Entities; (7) a claim for an accounting of the Post Oak Entities and of T-4 Farm; (8) a request for the appointment of an auditor to determine the value of the Post Oak Entities' assets and of each partner's interest; and (9) a request for declaratory judgments construing the Post Oak Entities' company agreements and recognizing Gregory's violations of those agreements. The portion of Appellees' petition that sets forth these causes of action summarizes the facts supporting each of them and contains no mention of the T&K Entities or the Kidd family at all. Appellees do not allege breaches of duties related to Gregory's involvement in the T&K Entities, they do not seek to recover for any funds stolen from the T&K Entities, and they do not request reimbursement for any investigation-related expenses paid by the T&K Entities. Although they use the background section of their petition to vilify Gregory by reciting his alleged misdeeds against the T&K Entities, such vilification could be

15

wholly deleted from the petition without altering the Post Oak Entities' factual basis for recovery.

Thus, the substance of the present dispute is confined to Gregory's theft from the Post Oak Entities and does not touch upon the T&K Entities' operations or similar matters. The Updated Business Plan contains no agreement to arbitrate the Post Oak Entities' claims.

## C. Protocol Agreement

Appellants next assert that, even if the Updated Business Plan's arbitration provision does not apply, the parties agreed to arbitrate the Post Oak Entities' claims as part of the Protocol Agreement. But unlike that of the Updated Business Plan, the Protocol Agreement's dispositive question is not the scope of the arbitration provision but whether it exists at all. *Cf. Rachal*, 403 S.W.3d at 845 (construing Texas Arbitration Act's application to "agreement[s]," quoting Black's Law Dictionary definition of an agreement, and noting that "although an agreement need not meet all the formal requirements of a contract, it must be supported by mutual assent").

Appellants point to the Protocol Agreement's verbiage "agree[ing] to . . . mediat[e] . . . before commencing arbitration" and "agree[ing] not to commence arbitration during the activities to be conducted under the Protocol [Agreement]." They emphasize the longstanding legal principles that "magic words" are not decisive in contract interpretation and that courts apply a presumption in favor of arbitration. *See id.* at 850 (recognizing "strong presumption favoring arbitration" and noting that

16

courts "resolve doubts as to the agreement's scope in favor of arbitration"); *J.M. Davidson*, 128 S.W.3d at 227 (similar); *Greystone Multi-Family Builders, Inc. v. Tes Elec., LP*, No. 01–15–00640–CV, 2016 WL 3362208, at *5 (Tex. App.—Houston [1st Dist.] June 16, 2016, no pet.) (mem. op.) (rejecting argument that the lack of "standard mandatory-arbitration-clause language indicate[d] that the parties did not intend arbitration to be mandatory" and explaining that contract construction does not turn on "the inclusion or exclusion of 'magic words'"). And according to Appellants, the combination of these two things—the Protocol Agreement's verbiage and the longstanding legal principles—equates to an arbitration provision.

But while magic words are not required to form an arbitration agreement, the Protocol Agreement contains zero words agreeing to mandatory arbitration—magic or otherwise. The relied-upon verbiage certainly refers to arbitration, but nowhere in the Protocol Agreement do the parties commit to that forum.[13] To the contrary, the Protocol Agreement anticipates that at least some of the parties' disputes may be litigated by recognizing that disclosure orders could be issued by either "a Court of competent jurisdiction or an arbitrator appointed pursuant to [the] arbitration agreement in the Updated Business Plan." The verbiage relied upon by Appellants reflects nothing more than an agreement that, if the parties commence arbitration, they will "participate in a mediation with JAMS before commencing [that] arbitration"

---

[13]*Cf. Famous Water*, 2024 WL 2971686, at *3 (describing arbitration clause as a "specialized kind of forum-selection clause").

and will "not . . . commence [the] arbitration" while the Protocol Agreement's procedures are underway.

"Although [Texas courts] have repeatedly expressed a strong presumption favoring arbitration, the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists." *J.M. Davidson*, 128 S.W.3d at 227; *see Wagner*, 627 S.W.3d at 282–85 (clarifying that presumption applies to scope analysis and noting that "[o]nce a party has proved that a valid arbitration agreement exists, '[d]oubts regarding an agreement's *scope* are resolved in favor of arbitration'"). Favored or not, courts cannot manufacture an arbitration agreement *ex nihilo*. *See Famous Water*, 2024 WL 2971686, at *3 (noting that arbitration "is a matter of consent, not coercion" and that "Texas law encourages parties to resolve disputes through arbitration, but it will not force them to arbitrate unless they have agreed to that alternative"). And here, based on the Protocol Agreement's plain language, no arbitration agreement exists.

## III. Conclusion

Neither the Updated Business Plan nor the Protocol Agreement reflects an agreement to mandatory arbitration of the Post Oak Entities' claims. We overrule Appellants' dispositive first issue and affirm the trial court's order denying the motion to compel arbitration and stay the trial court proceedings. *See* Tex. R. App. P. 43.2(a).

18

The temporary stay previously granted by this court is hereby lifted.


/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice


Delivered:  June 19, 2025